[No. A073708. First Dist., Div. One. Aug. 1, 1997.]

CITIZENS FOR RESPONSIBLE GOVERNMENT, Plaintiff and Appellant, v.
CITY OF ALBANY, Defendant and Respondent;
LADBROKE RACING CALIFORNIA, INC., et al., Real Parties in Interest and Respondents.

1200

**Counsel**

Robert R. Outis, Weatherford & Taaffe and Daniel J. Taaffe for Plaintiff and Appellant.

Manuela Albuquerque, City Attorney (Berkeley), Zach Cowan, Assistant City Attorney, Anne E. Simon and James L. Pierce as Amici Curiae on behalf of Plaintiff and Appellant.

Robert Zweben, City Attorney, Cassidy & Verges, Stephen K. Cassidy and Anna C. Shimko for Defendant and Respondent.

Remy, Thomas and Moose, Michael H. Remy, Whitman F. Manley and Paula A. Hartman as Amici Curiae on behalf of Defendant and Respondent.

Gibson, Dunn & Crutcher, Robert W. Loewen, Fred L. Pillon, Amy R. Forbes and Steven J. Johnson for Real Parties in Interest and Respondents.

## OPINION

SWAGER, J.—Citizens for Responsible Government, a nonprofit public benefit corporation, appeals from a judgment of dismissal of its complaint for a writ of mandate and declaratory relief against the City of Albany (hereafter City) and real parties in interest, Ladbroke Racing California, Inc. and SF Casino Management Inc. (hereafter Ladbroke). We reverse in part and remand.

### PROCEDURAL AND FACTUAL BACKGROUND

The appeal concerns a series of actions by the City, culminating in a vote of the electorate, to permit cardroom gaming at Golden Gate Fields, a horse racing track managed by Ladbroke. The racetrack is the only present use on 160 acres of land, locally known as the Albany Waterfront, located along the shore of San Francisco Bay to the west of interstate 80. The underlying land in the vicinity of the racetrack is owned by Catellus Development Company which leases it to Ladbroke.

The waterfront is zoned for "commercial recreation" and allows the racetrack as a conditionally permitted use. The Albany general plan, adopted in 1975 and updated in 1992, assumes the horse racing facility "will remain unchanged throughout the planning period" but also contemplates "development of public parks and public access at the Waterfront." It states that "[g]aining increased park and open space lands and formal public access for this area are important City goals." For more than a decade, the East Bay Regional Park District has endeavored to assemble an Eastshore State Park and Bay Trail, ringing the entire shore of the Bay. The general plan provides that any future development must account for "the proposed park and open space development as part of the Eastshore State Park."

Reflecting public concern about the future of the waterfront, in 1990 the Albany electorate approved an initiative measure, identified as Measure C, which amended the zoning ordinance to require voter approval of any future zoning amendment, change in the general plan, or development agreement with the City which would have a material impact on the present use of the area. The measure was proposed and adopted as an exercise of Albany's legislative power as a charter city.

Golden Gate Fields racetrack is a major source of revenue for the City but it has experienced declining patronage. Crowds have fallen from around 15,000 to 20,000 people per day 10 years ago to a current range of between 4,000 to 10,000 people. In 1992, the city council formed a fiscal task force

and requested it to study the possibility of cardrooms at the racetrack. In a report given May 25, 1994, the fiscal task force announced that it had initiated discussions with Ladbroke on the subject of a cardroom and recommended further exploration of the proposal.

At a meeting on June 6, 1994, the city council directed its staff to prepare necessary documents to put a ballot proposal for a cardroom on the ballot for the next General Election under the authority of Measure C. The deadline for placing the measure on the November ballot was August 12, 1994. Apparently to expedite the proceeding, the city council rescinded its existing procedures for approval of development agreements reflected in resolution No. 85-78, relying instead on the less demanding procedural requirements of state law. (Gov. Code, § 65867.) Between June 6, and August 1, 1994, the city council held no fewer than seven public hearings relating to the cardroom proposal, and the planning commission held another four public hearings. This intense activity produced: (1) a zoning amendment allowing gaming as a permitted use in the waterfront area, (2) a gaming ordinance regulating cardroom gaming, (3) a 95-page development agreement with Ladbroke, and (4) a ballot proposal to authorize gaming within the city limits as required by Business and Professions Code section 19819.

As described in the development agreement, the gaming facility would be built largely in the northern portion of the existing grandstand structure of Golden Gate Fields but would include a new 2-story structure with up to 34,000 square feet, projecting no more than 80 feet into an existing parking lot and a porte cochere structure of up to 4,000 square feet. The entire facility would occupy a maximum of 125,000 square feet and would accommodate as many as 150 gaming tables serving between 800 and 1,000 people, together with restaurants, bars, and administrative areas. It would be open 24 hours a day, 365 days per year.

On August 1, 1994, the city council passed three resolutions ordering the development agreement, zoning amendment, gaming ordinance and authorization of gaming within the City be placed on the ballot for the General Election on November 8, 1994, as parts of a single ballot proposal, combining all legal approvals in one package. In the General Election on November 8, 1994, the ballot measure, designated Measure F, passed by 3,281 to 3,095 votes, or by a margin of 51.5 percent to 48.5 percent.

On January 27, 1995, appellant filed its petition alleging six causes of action in the superior court. The petition was subsequently amended to add two additional causes of action. The causes of action which are before us on

appeal are: the first cause of action alleging that City failed to comply with California Environmental Quality Act (CEQA) prior to submitting Measure F to the voters; the second alleging that City did not comply with the requirements of Measure C; the fourth challenging the constitutionality of the development agreement; the sixth alleging that Measure F violated Business and Professions Code section 19819; the seventh alleging that Measure F is unconstitutional; and, the eighth alleging that Measure F failed to meet certain city procedural requirements. The trial court dismissed the fourth, sixth, seventh and eighth causes of action after sustaining demurrers to those causes of action. A hearing was held on the remaining causes of action and this appeal followed.

Over a year later, and subsequent to the conclusion of the hearing in the trial court, the Albany city administrator and a Ladbroke officer executed an "Administrative Implementation Memorandum" dated February 7, 1996, in which they agreed that the City would prepare a full environmental impact report upon Ladbroke's submission of "a project application." Subsequently, the City, Ladbroke and the Sierra Club entered into an "Agreement Relating to Albany Cardroom" (hereafter Sierra Club Agreement), which the Albany mayor was authorized to sign by a resolution of an executive session of the city council on February 20, 1996. The Sierra Club Agreement states that "[n]otwithstanding anything to the contrary in the development agreement," the City would prepare an environmental impact report and adopt mitigation measures "to the extent required by CEQA."

## DISCUSSION

Our discussion of the issues raised in this appeal and our opinion are confined to the legal errors raised by appellant relating to the procedure that the City employed to place Measure F on the ballot. The wisdom of the land uses permitted by Measure F are not proper subjects of inquiry for this court. That is an issue that can only be decided by the citizens of the City.

### I. *Interpretation of Measure C*

We consider first appellant's contention that, under Measure C, the city council is required to approve land use measures affecting the water-front before it submits the measures to the voters for their separate approval. In effect, appellant views Measure C as requiring a mandatory referendum on such land use measures adopted by the city council which does not dispense with existing procedural steps involving consideration by the planning commission, notice, hearing, staff reports, and interagency consultations. The respondent adopts a sharply opposing interpretation. In its view,

Measure C establishes an exclusive procedure for amending land use regulations directly by voter approval that dispenses with other preelection procedures. They compare the measure to Elections Code section 9222 which gives a city council a general grant of authority to submit proposed ordinances directly to the electorate for their approval.

We construe Measure C as neither requiring nor precluding the sort of process of dual approval, first by the city council and then by the electorate, that appellant advocates and respondent opposes. The limited effect of the measure is only to require voter approval of land use measures affecting the waterfront. We are governed by the plain language of Measure C: "The following actions, if they authorize any use not authorized by the zoning ordinance for the Waterfront District as of the effective date of this ordinance, *shall only be taken by passage of a ballot measure* approved by a majority of voters voting. [¶] 1. Any amendment to the land use designations for the Waterfront Area in the City's General Plan; [¶] 2. The establishment of, or any material amendment to, the Waterfront Master Plan or other specific plan for the Waterfront area. . . . [¶] 3. Any amendment to the zoning ordinance for the Waterfront area including changes to the text and changes to the map of the Waterfront area; [¶] 4. The entry into any development agreement and/or any material amendment to a development agreement for the Waterfront area. . . ." (Italics added.)

The critical language, "shall only be taken by passage of a ballot measure," plainly requires voter approval of land use measures affecting the waterfront area, but it demands nothing more. Measure C does not refer to the voter approval as following a prior approval by the city council or use terms, such as ratification or referendum, that might indirectly allude to such prior approval. Since the operative provisions of the measure do not address the question of dual approval, we do not think it can be reasonably construed as imposing such a requirement. On the other hand, the language of Measure C is flexible enough to accommodate the concept of dual approval; the phrase, "shall only be taken by passage of a ballot measure" can be read to mean "shall only become effective upon" voter approval of the measure. The declaration of purpose in section 2 unquestionably contemplates the possibility of successive approvals by the city council and the electorate. For example, subsection (d) refers to the desirability of "an additional step of voter approval." The official voter's pamphlet contains arguments in favor of the measure and an analysis by the city attorney that are to the same

effect. In light of the statement of purpose and legislative history,[1] we would not be justified in construing the measure as providing an exclusive procedure involving direct voter approval that precludes any prior approval by the city council.

We conclude that the trial court properly denied relief based solely on an interpretation of Measure C. By requiring a vote of the electorate in connection with land use measures affecting the waterfront area, the initiative measure imposes no specific requirements regarding preelection approvals.

## II. Compliance With CEQA

In its principal assignment of error, appellant argues that the City improperly claimed an exemption from the provisions of CEQA. From its initial meeting on June 6, 1994, in which it directed the staff to prepare documentation for the cardroom proposal, the city council proceeded on the assumption that its proceedings and those of the planning commission were exempt from the CEQA requirements of environmental review because they were directed at submitting a ballot measure to the voters. Following the election, the planning director filed a "notice of exemption" relating to the project which stated: "The submittal of a ballot measure to a vote of the people does not constitute a project under CEQA, pursuant to Sec. 15378 (b)(4). Therefore, the project is exempt under Sec. 15061 (b)(1)."

### A. General Principles

The statutory scheme of CEQA rests on the requirement of Public Resources Code section 21151 that "[a]ll local agencies shall prepare . . . an environmental impact report on any project that they intend to carry out or approve which may have a significant effect on the environment." The environmental impact report (EIR) serves to provide public agencies and the

---

[1] While the courts will disregard legislative declarations in "irremediable conflict" with substantive provisions of a statute (*Jarvis* v. *Cory* (1980) 28 Cal.3d 562, 570 [170 Cal.Rptr. 11, 620 P.2d 598]), the declarations are still "entitled to great weight" (*People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 493 [96 Cal.Rptr. 553, 487 P.2d 1193]; *CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 321 [118 Cal.Rptr. 315]) and "will be upheld unless they are found to be unreasonable and arbitrary." (*California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 583 [131 Cal.Rptr. 361, 551 P.2d 1193].) In short, "[a] court is . . . obliged to construe the statute according to the Legislature's own statement of its purpose, if it can." (*Botello* v. *Shell Oil Co.* (1991) 229 Cal.App.3d 1130, 1135 [280 Cal.Rptr. 535].)

To resolve ambiguities in initiative propositions, the courts may consider indicia of the voters' intent found in "the analysis and arguments contained in the official ballot pamphlet." (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 504 [286 Cal.Rptr. 283, 816 P.2d 1309].)

public in general with information about the effect that a proposed project is likely to have on the environment; and to "[i]dentify ways that environmental damage can be avoided or significantly reduced." (Cal. Code Regs., tit. 14,[2] § 15002.) ■ "Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects not only the environment but also informed self-government.' [Citation.]" (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].)

In addition to identifying significant environmental effects, the EIR must "[d]escribe measures which could minimize significant adverse impacts" and "[d]escribe a range of reasonable alternatives to the project." (Guidelines, § 15126, subds. (c) and (d).) Among the alternatives, the report must evaluate "[t]he specific alternative of 'no project.'" (Guidelines, § 15126, subd. (d)(4).) Our high court has described the mitigation and alternatives sections as "[t]he core of an EIR." (*Citizens of Goleta Valley* v. *Board of Supervisors*, *supra*, 52 Cal.3d at p. 564.) These sections reflect the legislative policy "that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (Pub. Resources Code, § 21002.)

To effect this policy, Public Resources Code section 21081 requires a public agency to make certain specific findings attesting to its consideration of the mitigation measures identified in the EIR. The findings must be supported by substantial evidence on the record. (Guidelines, § 15091.) If the project has a significant effect on the environment, the agency may approve the project only upon finding that it has "[e]liminated or substantially lessened all significant effects on the environment where feasible" and that any unavoidable significant effects on the environment are "acceptable due to overriding concerns" specified in section 21081. (Guidelines, § 15092.)

Since the provisions of CEQA apply only to "projects," the scope of the act is governed in significant part by the meaning of that term. In pertinent part, Public Resources Code section 21065 provides: "'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] . . . [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by

---

[2]Hereafter referred to as Guidelines.

one or more public agencies." But not all activities coming within this definition are subject to CEQA. Public Resources Code section 21080 states generally that "this division shall apply to discretionary projects" and provides a list of projects to which the division does not apply, including "[m]inisterial projects."

The meaning of the term "project" is further clarified in Guidelines section 15378. In a short list of activities that do not qualify as projects, subdivision (b) of section 15378 mentions ballot measures. This subdivision, on which respondent bases its claim of exemption, provides: "(b) Project does not include: [¶] . . . [¶] (4) The submittal of proposals to a vote of the people of the state or of a particular community. (*Stein* v. *City of Santa Monica,* 110 Cal.App.3d 458.)" Guidelines section 15061 provides that an exemption can be based on the fact that "[t]he activity is not a project as defined in Section 15378."

In considering whether the City properly construed this exemption, we will consider first the amendment to the zoning ordinance to permit a gaming facility and then the development agreement dealing specifically with the establishment of the cardroom.

### B. *Zoning Amendment*

■ The City's zoning ordinance had long provided for a "waterfront district" with certain conditionally permitted uses, including "commercial recreation," defined to include horseracing. In resolution No. 94-73, the city council submitted to the voters an amendment to the "waterfront district" ordinance adding a new "permitted use," which consisted of "[g]aming and associated uses, to the extent and of the nature authorized and required through the development agreement . . . ."

"Public Resources Code section 21080 provides that 'enactment and amendment of zoning ordinances' is a discretionary project subject to CEQA." (*City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 242 [227 Cal.Rptr. 899].) Conceptually, a zoning amendment is a project carried out by a public agency rather than a project which the agency approves. Guidelines section 15378, subdivision (a), provides: " 'Project' means . . . [¶] . . . [a]n activity directly undertaken by any public agency including . . . enactment and amendment of zoning ordinances . . . ." It does not follow, however, that all zoning amendments require CEQA compliance. Respondent claims that Guidelines section 15378, subdivision (b)(4), exempts those zoning amendments involving "[t]he submittal of proposals to a vote of the people of the state or of a particular community."

Guidelines section 15378, subdivision (b)(4), was construed in *Stein* v. *City of Santa Monica* (1980) 110 Cal.App.3d 458 [168 Cal.Rptr. 39] and now contains a reference to that decision as authority. The *Stein* decision concerned an initiative for a city charter amendment that was placed on the ballot pursuant to a petition of the registered voters in accordance with Government Code section 34459. The court held that the act "of placing the issue on the ballot and certifying the [election] result as a charter amendment qualifies as a nondiscretionary ministerial act not contemplated by CEQA." (*Stein* v. *City of Santa Monica, supra,* at p. 461.) It noted that, under Government Code section 34461, the city was required to " 'submit the amendment . . . to the electors,' be it determined that the petition has the requisite number of signatures. The procedure employed in amending the charter involved no discretionary activity directly undertaken by the city. It was an activity undertaken by the electorate and did not require the approval of the governing body." (*Stein* v. *City of Santa Monica, supra,* at pp. 460-461.)

A more recent decision, *Lee* v. *City of Lompoc* (1993) 14 Cal.App.4th 1515 [18 Cal.Rptr.2d 389], concerns a ballot measure, like Measure F, which the city council itself submitted to the voters under Elections Code section 9222 (formerly § 4017). A developer proposed to build a shopping center on land reserved for other uses in the City's land use plans and zoning ordinance. The city council prepared and approved an EIR but was unable to reach a decision on the land use changes required for the development. To resolve a deadlock, it submitted to the voters a ballot measure proposing changes in the general plan, specific plan, and zoning ordinance. The measure passed at a special election. The plaintiffs then filed a petition for writ of mandate ordering the city to set aside its approval of the EIR. Without considering the adequacy of the EIR, the trial court relied on Guidelines, section 15378, subdivision (b)(4), to find "that CEQA did not apply to the electorate's approval of the land use changes . . . ." (*Lee* v. *City of Lompoc, supra,* 14 Cal.App.4th at p. 1519.)

Affirming the trial court, the court of appeal noted that "Guidelines section 15378 subdivision (b)(4) does not distinguish between submittal of ballot measures by a public agency from those submitted by voter initiative petitions." The Guideline "was promulgated in 1973 and has never been amended, only renumbered from 15037 to 15378. . . . There is a strong presumption that the administrative interpretation set forth in the CEQA Guidelines is consistent with legislative intent. [Citation.] The Guidelines are to be given 'great weight' in interpreting CEQA statutory provisions." (*Lee* v. *City of Lompoc, supra,* 14 Cal.App.4th at p. 1523.)

The *Lee* court recognized that the submittal of ballot measures to the voters may sometimes involve a prior approval by an administrative agency requiring CEQA compliance. Thus, in *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779 [187 Cal.Rptr. 398, 654 P.2d 168] and *People* ex rel. *Younger* v. *Local Agency Formation Com.* (1978) 81 Cal.App.3d 464 [146 Cal.Rptr. 400], the administrative agencies were required by statute to approve the measures at issue before submitting them to the electorate for voter approval. But distinguishing these precedents, the court held that, under the facts of the case, the act of submitting an ordinance to the electorate pursuant to Elections Code section 9222 did not constitute an "approval" of the measure by the city council: "Under CEQA, 'approval' means the decision by a public agency which commits the agency to a definite course of action regarding a project. The city council's resolution to place the matter on the ballot did not constitute an 'approval' under CEQA because it did not commit the council to a definite course of action. [Citation.] The city council's further action was expressly contingent on the results of the vote." (*Lee* v. *City of Lompoc, supra,* 14 Cal.App.4th at pp. 1523-1524.)

We consider that the *Lee* decision governs the submittal of the zoning amendment to the voters in the present case. The action required to put an ordinance on the ballot under Measure C is analogous to that permitted by Elections Code section 9222. Following the *Lee* decision, we hold that the submittal of the zoning amendment to a vote of the people was exempt from CEQA under the provisions of Guidelines section 15378. The electoral approval of the development agreement, however, presents different and more complicated issues.

## C.  *Development Agreement*

### (1)  *Application of CEQA*

■ Development agreements are creatures of legislation intended to provide developers with an assurance of their right to carry a project to completion and for which they may need to make initial commitments. The legislation was enacted in 1979 in response to the decision in *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546], which restated the traditional late vesting rule with respect to when a developer acquires a vested right to complete a project in accordance with a permit. In effect, the legislation allows "a builder to acquire by contract the equivalent of a vested right at an early stage of the project." (Sigg, *California's Development Agreement Statute* (1985) 15 Sw.U.L.Rev. 695, 707.)

The development agreement legislation begins with a legislative declaration that it is intended to provide an "[a]ssurance to the applicant for a development project that upon approval of the project, the applicant may proceed with the project in accordance with existing policies, rules and regulations . . . ." (Gov. Code, § 65864, subd. (b).) As provided by Government Code section 65865.2, a development agreement "shall specify the duration of the agreement, the permitted uses of the property, the density or intensity of use, the maximum height and size of proposed buildings, and provisions for reservation or dedication of land for public purposes. The development agreement may include conditions, terms, restrictions, and requirements for subsequent discretionary actions, *provided that such conditions, terms, restrictions, and requirements for subsequent discretionary actions shall not prevent development of the land for the uses and to the density or intensity of development set forth in the agreement.*" (Italics added.)

■ The development agreement between the City and Ladbroke expressly relies on this statutory authority. The recitals state that the City has determined "to provide appropriate assurances to Ladbroke regarding its ability to complete the Project." To this end, article III, section 3.1 provides: "Ladbroke shall have the right to develop the Project in accordance with the terms and conditions of this Agreement; and City shall have the right to control development of the Project in accordance with the provisions of this Agreement." Other provisions give Ladbroke the right to bring an action for specific performance and to recover attorney fees in an action to enforce the agreement.

The term "Project" is defined in exhibit B of the development agreement which specifies in detail the permitted structures, uses, and required improvements. Among other things, the exhibit specifically allows construction of a structure with a maximum floor space of 125,000 square feet and gives Ladbroke the right to operate "up to 150 gaming tables," together with various associated facilities. Among the required improvements, the exhibit mentions dedication of a 14-foot wide easement for a "Bay Trail," and dedication of other specific areas described in the development agreement for landscaping, buffer, public access and use, and conservation purposes.

The City's "right to control development of the Project in accordance with the provisions of this Agreement," provided in article III, section 3.1, refers chiefly to the section requiring "City Implementation Approval." Under article IV, section 4.2, Ladbroke must apply for this approval within 90 days of the effective date of the agreement. The approval is required "to develop, use and operate the Project" and is to be granted in accordance with the

standards and conditions contained in the development agreement. In particular, article III, section 3.5 makes clear that the City cannot impose any "exaction" not provided in the agreement, as a condition of granting the approval: "City shall not impose, in connection with the granting of City Approvals . . . any Exaction other than those called for under this Agreement." The term "Exaction" is broadly defined to denote: "[a]n exaction (other than Fees and City Taxes), Dedication or reservation requirement, an obligation for on- or off-site improvements, or construction requirements for public improvements or for services called for in connection with the development of the Project . . . ."

As we read article IV, section 4.2, the language reflects the required content of a development agreement set forth in Government Code section 65865.2, and it should therefore be construed consistently with that statute. The agreement as a whole manifests the parties' intent to rely on and strictly follow the statutory pattern of a development agreement.[3] Indeed, any other interpretation of the parties' intent would lead to questions of illegality which they presumably intended to avoid. Thus, we read the provision as saying that, in exercising its discretionary power to grant City implementation approval, the City cannot take any action that would "prevent development of the land for the uses and to the density or intensity of development set forth in the [development] agreement." (Gov. Code, § 65865.2.)

In view of the vested rights that it confers on Ladbroke, it seems clear that the development agreement qualifies as a "project" subject to the provisions of CEQA. As we have noted, Public Resources Code section 21065, subdivision (c), defines the term "project" to include an activity involving the issuance of an "*entitlement for use* by one or more public agencies." (Italics added; see also Guidelines, § 15378, subd. (a)(3).) Since the development agreement gave Ladbroke a vested right to complete a gaming facility within certain clear and narrowly defined parameters, it constituted an "entitlement for use" within the meaning of the statute.

The more difficult question is whether CEQA required environmental review before the development agreement could be submitted for electoral approval. As we have noted, a public agency is required to conduct an environmental review leading to an EIR or negative declaration before it may "approve" or "carry out" a project. (Pub. Resources Code, §§ 21080,

---

[3]See, for example, the language in recital G: "For these reasons, City has determined that the project is a development for which a development agreement is appropriate in order to achieve City's goals, policies and objectives and to provide appropriate assurances to Ladbroke regarding its ability to complete the Project."

subd. (c), 21151, 21061.) Citing *Lee* v. *City of Lompoc, supra*, 14 Cal.App.4th 1515, respondent claims that the City did not itself approve the development agreement but merely referred it to the electorate for their approval. Relying on *People* ex rel. *Younger* v. *Local Agency Formation Com., supra*, 81 Cal.App.3d 464 and *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra*, 32 Cal.3d 779, appellant maintains that the city council conditionally approved the measure, subject to a favorable vote of the electorate, under circumstances that called for CEQA review. The issue calls for careful consideration of the record, pertinent CEQA Guidelines, and the applicable case law.

The development agreement recites that the City staff duly reviewed Ladbroke's application for a development agreement and reported on it at noticed public hearings. On July 11, 1994, the city council rescinded its existing procedure for consideration of development agreements, found in resolution No. 85-78, resolving that it would follow the procedures of state law in considering future development agreements. Government Code section 65867 called only for hearings "by the planning agency and by the legislative body."[4] The planning commission in fact held two public hearings on the proposed development agreement and then recommended it for the approval of the city council.

At a city council meeting on August 1, 1994, the City's outside counsel presented the terms of the latest draft of the development agreement. Following discussion, one minor provision concerning notice of termination was changed. The city council then adopted resolution No. 94-72 which submitted to the voters a final draft of the agreement which was set forth in full as an attachment to the resolution and directed that the complete 95-page text of the agreement be included in the voter pamphlet. As required by Government Code section 65867.5, the resolution found that "the uses authorized in this development agreement" were consistent with the City's general plan.[5]

The development agreement was dated as of its "adoption date," which was defined to be August 1, 1994, the date the city council adopted the

[4]In this appeal, appellant raises the theory that resolution No. 85-78 was a legislative act, subject to referendum, which remained effective for 30 days after the city council adopted the resolution rescinding it (Elec. Code, § 9141) and therefore the city council acted beyond its powers in failing to comply with the procedures it prescribed. The issue, however, is not properly before us because a failure to comply with resolution No. 85-78 was not alleged as a basis for relief in appellant's complaint for writ of mandamus and declaratory relief.

[5]Amicus curiae, the City of Berkeley, contends that, by submitting the development agreement to the voters, the city council acted beyond the scope of its powers under Government Code section 65864 et seq., which requires adoption of development agreements by the legislative body of a municipality. Since it was not raised in the proceedings below, we express no opinion on the issue.

resolution putting the text of the agreement on the ballot. The rights and obligations of the parties, however, were to take effect on the "effective date" which was defined as the date election results approving the agreement were certified by the city council or, if the validity of the agreement should be challenged by a legal proceeding, the date the legal proceedings were finally concluded.

As we have seen, the development agreement was submitted to the voters as part of a package of measures authorizing and regulating the proposed cardroom. On December 13, 1994, following certification of election results, the City's mayor executed the development agreement in the form it was submitted to the voters.

The term "approval," as it is used in CEQA, is defined in Guidelines section 15352 as follows: "(a) 'Approval' means the decision by a public agency which *commits the agency to a definite course of action* in regard to a project intended to be carried out by any person. . . . [¶] (b) With private projects, approval occurs upon the earliest commitment to issue . . . a discretionary contract, . . . or other entitlement for use of the project." In a closely related context, the term "discretionary project" is defined to denote a decision requiring "the exercise of judgment or deliberation." (Guidelines, § 15357, italics added.)

The Supreme Court decision in *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d 779, concerned the approval of a project subject to a later vote of the electorate affected by it. The State Board of Education approved a plan to create a new Yorba Linda School District out of a portion of the Fullerton High School District and directed that the proposal be submitted for approval in an election conducted within the proposed district. Seeking to prevent the election, Fullerton High School District claimed the board failed to comply with CEQA in approving the plan for the new district. The court held that the board violated CEQA by approving the plan without making an initial study to assess possible environmental impacts.

Finding that the board's action constituted approval of a project within the meaning of CEQA, the court reasoned that "as a practical matter State Board approval of the secession Plan is an essential step leading to ultimate environmental impact . . . ." (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d at p. 797.) It is "a necessary step in a chain of events which would culminate in physical impact on the environment." (*Id.* at p. 795.) If environmental review were delayed until after the

election, it would "as a practical matter [preclude] the alternative of continuing the status quo. Once the voters approve the secession Plan the new Yorba Linda Unified School District will have to build a high school, and Fullerton HSD will have to adjust to the loss of the Yorba Linda students." (*Id.* at p. 797.)

In the course of its analysis, the court rejected a claim that the board's action came within the exemption for ballot measures now expressed in Guidelines section 15378, subd. (b)(4) (formerly Cal. Admin. Code, tit. 14, § 15037). Citing *People* ex rel. *Younger* v. *Local Agency Formation Com.*, *supra*, 81 Cal.App.3d 464, the court stated, "It is clear . . . that Board's approval of the Plan is not exempt from CEQA merely because that approval must be ratified by the voters." (*Fullerton Joint Union High School Dist.* v. *State Bd. of Education*, *supra*, 32 Cal.3d at p. 796.)

The *Younger* decision held that a local agency formation commission (LAFCO) was required to prepare an EIR in connection with its approval of a plan to "deannex" a 25-square-mile territory from the City of San Diego. The LAFCO approval allowed residents in the territory to place the issue of deannexation on the ballot in a special election. The court held that the CEQA exemption now expressed in Guidelines section 15378, subdivision (b)(4), applying to the submittal of proposals to a vote of the people, had no application to the LAFCO approval: "The 'project' here is more than the 'submittal of proposals to a vote of the people.' Rather, it is but the first step required by statute on a deannexation proposal with consequent substantial impact on the physical and human environment. A deannexation proposal requires voter approval only after initial decision by LAFCO and LAFCO approval. If LAFCO disapproves the deannexation proposal, it cannot come to a vote." (*People* ex rel. *Younger* v. *Local Agency Formation Com.*, *supra*, 81 Cal.App.3d at p. 479.)

As we read the *Fullerton* and *Younger* decisions, they support the proposition that the approval of a project by a public agency may be subject to CEQA review even though it is conditioned on the outcome of a vote of the electorate affected by the project. Respondent points out that, in both cases, the public agency acted in accordance with an express "statutory delegation" requiring it to approve the kind of proceedings at issue. But for purposes of CEQA compliance, the absence of express statutory delegation should not necessarily be the controlling consideration. As stated in Guidelines section 15352, subdivision (a), the pertinent question is whether the public agency "commits [itself] to a definite course of action . . . ." The holdings of the decisions necessarily imply that a public agency may make such a commitment even though its decision is contingent on a later vote by an affected district.

Applying these principles to the case at bar, we conclude that the city council approved a project within the meaning of CEQA when it submitted the development agreement to the voters in resolution No. 94-72. The critical consideration, in our opinion, is that the city council submitted a fully negotiated development agreement to the voters, together with other measures required for its immediate implementation. The negotiation of the 95-page development agreement—from the time of Ladbroke's initial application for a development agreement through the processes of staff review and three public hearings—unquestionably involved the exercise of judgment and deliberation, culminating in a decision to adopt an agreement with specific negotiated terms. In its meeting on August 1, 1994, the city council effectively adopted this draft of the document, after making one minor change, even though it neglected to pass a formal resolution reciting this action. It was this particular draft—not the general concept of a development agreement—that was submitted to the voters in Measure F. In fact, the mayor executed the development agreement on behalf of the City shortly after the election results were certified. Similarly, the city council's finding, pursuant to Government Code section 65867.5, that the development agreement was consistent with the general plan referred to this specific document and indeed would have been meaningless if the city council had not first adopted a specific agreement.

The effect of including other related measures in Measure F—the gaming ordinance, the amendment to the zoning ordinance, and the gaming authorization—was to give the City the power to immediately implement the development agreement in the form submitted to the voters, without further consideration, if the outcome of the election should be favorable. Like the conditional approvals in the *Fullerton* and *Younger* decisions, the action of the city council committed it to a definite course of action that was contingent only on the outcome of the election. This action entailed approval of a project within the meaning of Public Resources Code section 21151 and other related statutes.

### (2) *Subsequent Administrative Approval*

▉ Respondent objects that the development agreement itself provides for a process of environmental review. Article IV of the development agreement specifies in detail "the information, documents and materials" which Ladbroke is required to submit to obtain City implementation approval. Without mentioning CEQA or such concepts as a negative declaration or environmental impact report, article IV, 4.2.10 requires Ladbroke to "submit such other studies, data and analyses as are necessary or appropriate

to address any potential adverse environmental impact of the Project identified by City. . . . [These materials] shall detail the nature of any such adverse impacts (or the bases for concluding that no such adverse impacts exist), and specify mitigation measures to reduce to an acceptable level, or eliminate, any such adverse impacts." The provision concludes: "All reasonably feasible mitigation measures shall become conditions of the City Implementation Approval to be performed in accordance with the provisions of the City Implementation Approval."

By calling for "reasonably" feasible mitigation measures, the development agreement, article IV, section 4.2.10 uses a qualifying term not found in CEQA. Moreover, it is not clear whether the section can be reconciled with the procedural requirements of CEQA. The procedure for city implementation approval calls only for a public hearing before the planning commission and a public hearing before the city council. Under article XV, section 15.2, all approvals required by the development agreement will be "deemed given within thirty (30) days after receipt of the written request for approval" unless the agreement makes provision for another "specific time period." In contrast, the CEQA Guidelines direct the lead agency to allow specific periods to determine whether an application is complete (Guidelines, § 15101), to prepare and issue a negative declaration (Guidelines, § 15107) and to prepare an environmental impact report (Guidelines, § 15108) and require the agency to circulate the draft negative declaration or environmental impact report (Guidelines, §§ 15072, 15086) and to allow public comment and review of the document (Guidelines, §§ 15073, 15087).

Even if these difficulties could be resolved by a process of interpretation and amendment, article IV, section 4.2.10 still does not suffice to bring the development agreement in compliance with CEQA. First, CEQA has been construed to require timely environmental review of development projects. "[T]he Legislature intended that environmental considerations play a significant role in governmental decision-making." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 263 [104 Cal.Rptr. 761, 502 P.2d 1049] disapproved on other grounds in *Kowis* v. *Howard* (1992) 3 Cal.4th 888, 896 [12 Cal.Rptr.2d 728, 838 P.2d 250].) Consequently, it is desirable that "EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment. [¶] . . . [¶] (2)With private projects, [the public agency] shall encourage the project proponent to incorporate environmental considerations into project conceptualization, design, and planning at the earliest feasible time." (Guidelines, § 15004, subd. (b); *Fullerton Joint*

*Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d 779, 797; *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 282 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Stand Tall on Principles* v. *Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 780 [1 Cal.Rptr.2d 107]; *Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 35 [143 Cal.Rptr. 365].)

Under this standard, the appropriate time to introduce environmental considerations into the decision making process was during the negotiation of the development agreement. Decisions reflecting environmental considerations could most easily be made when other basic decisions were being made, that is, during the early stage of "project conceptualization, design and planning." Since the development site and the general dimensions of the project were known from the start, there was no problem in providing "meaningful information for environmental assessment." At this early stage, environmental review would be an integral part of the decisionmaking process. Any later environmental review might call for a burdensome reconsideration of decisions already made and would risk becoming the sort of *"post hoc* rationalization[] to support action already taken," which our high court disapproved in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 394 [253 Cal.Rptr. 426, 764 P.2d 278].

Second, by entering into the development agreement, the City contracted away its power to consider the full range of alternatives and mitigation measures required by CEQA.[6] We will consider the matters of open space and traffic as examples.[7] The development agreement requires Ladbroke to dedicate its leasehold interest to the following open space uses: a 14-foot-wide strip of land for a "Bay Trail," a buffer zone between 1 and 20 feet in width along the side of the Bay Trail, an additional buffer of 1.75 acres adjacent to a beach area, and 2 acres of a marsh for a conservation easement. Other provisions call for precisely two acres of landscaping and for release of Ladbroke's leasehold interest to the "plateau" area. The "exactions" provision prohibits the City from requiring Ladbroke to make further dedications or reservations of land as a condition for granting the permit. Thus, in the event environmental review should call for dedication of open space,

---

[6]In *Lee* v. *City of Lompoc, supra,* 14 Cal.App.4th 1515, the City had not contracted away its ability to require complete CEQA review for the proposed shopping center. The court observed that: "The trial court correctly held that CEQA compliance would be required when a precise development plan for the shopping center was presented to the city." (*Id.* at pp. 1524-1525.)

[7]The sections dealing with design review (§ 4.2.9), capital improvements (§ 4.2.5) and lighting (§ 4.2.8) present somewhat analogous issues.

the City would be limited to (a) negotiating the configuration of the acreage Ladbroke has agreed to dedicate or release from its leasehold interest for this purpose, and (b) negotiating the extent of the buffer zone along the trail, insisting on a buffer closer to 20 feet than 1 foot, where feasible. There is no guarantee that concessions of this sort would enable the City to file a mitigated negative declaration (Pub. Resources Code, § 21080, subd. (c); Guidelines, § 15070) or to make the findings on mitigation required by Public Resources Code section 21081 for approval of a project.

Again, article IV, section 4.2.3 of the development agreement requires Ladbroke to provide a traffic improvement plan, prepared by a registered traffic engineer, which will take into account projected traffic conditions at the waterfront area and propose "traffic, parking and circulation" improvements which the City may require as a condition of granting city implementation approval. The matters to be considered in the traffic improvement plan are limited to the management of traffic generated by the proposed gaming facility and do not include changes in the operation or construction of the facility.[8] In contrast, CEQA requires consideration of "a range of reasonable alternatives to the project . . . which would *feasibly attain most of the basic objectives of the project*" (Guidelines, § 15126, subd: (d), italics added) and *"feasible mitigation measures available"* (Pub. Resources Code, § 21002, italics added) which would avoid or substantially lessen any significant environmental effects of the project. The lead agency must consider alternatives "even if [they] would impede to some degree the attainment of the project objectives, or would be more costly." (Guidelines, § 15126, subd. (d)(1).) To meaningfully consider such a range of alternatives and mitigation measures, the City might well need to consider possible restrictions on the uses contemplated by the project, such as reduction in the size of the facility or the hours of operation. The traffic plan required by article IV, section 4.2.3 does not extend to modification of projected uses, and, consistent with Government Code section 65865.2, the development agreement does not allow the City to require any change in the density or intensity of development as a condition for granting City implementation approval.

Third, the process of environmental review provided by article IV, section 4.2.10 of the development agreement does not include consideration of the alternative of "no project," as mandated by Guidelines section 15126, subdivision (d)(4). (See *Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910 [165

---

[8]We note also that CEQA calls for consultation with affected public agencies and public review of a negative declaration or draft EIR, not just consultation with a single traffic consultant selected by the parties. (E.g., Pub. Resources Code, §§ 21092 and 21153.)

Cal.Rptr. 401]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 203 [139 Cal.Rptr. 396].) Indeed, the purpose of a development agreement is to provide developers with an assurance that they can complete the project. After entering into the development agreement with Ladbroke, the City is not free to reconsider the wisdom of the project in light of environmental effects.

We conclude that article IV, section 4.2.10 does not suffice to bring the development agreement within the terms of CEQA. Our conclusion is based on the language of the section, which raises apparent conflicts with CEQA, the untimeliness of a deferred CEQA review following approval of the development agreement and related measures, and the City's limited discretion to adopt alternatives and mitigation measures that may be required for an adequate CEQA review.

### D. *Conclusion and the Subsequent Agreements*

Our analysis on the record before us leads to the conclusion that the city council's action in submitting the development agreement to the voters as part of Measure F constituted conditional approval of the project subject to environmental review under CEQA. In the absence of an exemption, the City was required to prepare an initial study to assess the necessity of an environmental impact report or negative declaration. (Pub. Resources Code, §§ 21080, subd. (c), and 21151; Guidelines, § 15063.) The project clearly involved a possibility of significant effects on the environment because of its potential for generating traffic and proximity to the ecologically sensitive San Francisco Bay shore. By failing to conduct any environmental review, the City did not proceed "in a manner required by law" in adopting resolution No. 94-72 (Pub. Resources Code, § 21168.5).[9]

The City and Ladbroke argue that they have committed themselves to conduct a full environmental review through the "Administrative Implementation Memorandum" dated February 7, 1996, and the related Sierra Club Agreement. We have taken judicial notice of these agreements because they present issues that must be adjudicated for a final resolution of this litigation. The most fundamental issue concerns the City's power to enter into the agreements.[10] If the agreements possess any validity, they will present other important issues, such as the possibility of achieving a kind of retroactive

---

[9]Our decision does not affect the validity of the order submitting the gaming ordinance to the voters.

[10]Article III, section 3.10 of the development agreement authorizes administrative implementation agreements only with respect to "refinements" and "details" that are not covered by the general terms of the agreement. Again, article XI, section 11.1 permits amendments to the

compliance with CEQA by later administrative action of this sort and the application of Measure C to the kind of subsequent city council action contemplated by the "Administrative Implementation Agreement." We cannot adjudicate the issues that they raise without giving the parties an opportunity to present evidence and arguments in support of their respective positions concerning the effect the agreements may have on the issues raised in this appeal. We therefore decide this appeal without reference to the agreements. Nevertheless, in the interest of a final resolution of the case, we remand the case to the trial court for further consideration of the first cause of action to determine the effect, if any, that these agreements have on the development agreement's compliance with CEQA.

### E. *The Gaming Registration Act*

In its sixth cause of action, appellant sought a declaration that the City is required to deny Ladbroke an application for a municipal gaming room license because of a failure to comply with the ballot form prescribed by Business and Professions Code section 19819. (See Albany Mun. Code, § 8-11.8.) Alternatively, it seeks a writ of mandate compelling the city to "deny any permit or license sought for the purpose of locating or operating a gaming club within the territorial limits of the city of Albany until the requirements of Business and Professions Code section 19819 have been satisfied." It now appeals the judgment entered upon an order sustaining respondent's demurrer to the sixth cause of action.

Business and Professions Code section 19819 requires the approval of the electorate for the licensing of new gaming clubs within a municipality and prescribes a ballot form for such elections: "The question shall appear on the ballot in substantially the following form: [¶] 'Shall card clubs in which any games permitted by law, such as draw poker, low-ball poker and panguingue (pan) are played be allowed in _____?' [¶] Yes_____ No_____"

The ballot form used in Measure F asked for voter approval of several measures related to the proposed cardroom and substantially elaborated on the language prescribed by Business and Professions Code section 19819. It submitted the following question to the voters: "Shall Ordinance 94-011, a gaming ordinance, zoning modification and Development Agreement, as printed in the Voter Pamphlet, be enacted to allow and regulate card room gaming at Golden Gate Fields, at which controlled games permitted by law, such as draw poker, low ball poker and Panguingue (PAN) are played, in

---

development agreement "only in the manner provided for in Section 65868 of the development agreement legislation."

order to provide revenue for the City of Albany, create jobs, provide for an Albany Bay Trail, and allow Albany waterfront access?"

In analyzing Measure F's compliance with Business and Professions Code section 19819, we begin with *Schauer* v. *Peek* (1942) 20 Cal.2d 681 [128 P.2d 337], the only decision which has considered a ballot measure deviating from a prescribed form. In *Schauer,* petitioners were required by a then existing constitutional provision to state on the ballot the date that their term of office would expire. Petitioners had recently been appointed to a new office and another constitutional provision required them to determine the length of their terms by lot *after* the general election. This later constitutional provision did not provide any way of determining their terms *before* the election so that it could be indicated on the ballot. The petitioners sought a writ of mandate to require the Secretary of State to accept ballots in the following form: "Shall . . . (name) . . . be elected to the office for the term prescribed by law?" The Supreme Court held that the proposed ballot form was in substantial compliance with the constitutionally required form: "Under these circumstances, it is impossible to specify upon the ballot the date when the terms for which petitioners are candidates expire. The section does not require that the form be followed exactly as set forth therein, but requires only substantial compliance therewith. The phrase 'for the term prescribed by law,' here used, is a substantial compliance with the constitutional provision." (*Id.* at p. 684.)

The *Schauer* decision suggests that the City had sufficient latitude under Business and Professions Code section 19819 to combine the ballot proposal required by section 19819 with related proposals for adoption of a gaming ordinance, zoning modification, and development agreement. If the electorate voted to allow cardrooms, the city would then need to adopt the other ordinances and take further steps to carry the voters' decision into effect. The City might reasonably find that the ballot would be more informative and useful by combining a package of related measures. Though the modification was not so clearly justified as was the modification in the *Schauer* decision, it also met "the circumstances of the particular election" by adding neutral language which served a municipal purpose. (9 Ops.Cal.Atty.Gen. 220, 222 (1947).)

We see no similar justification, however, for other modifications of the statutory form, specifically the reference to "controlled" games and the final phrase, "in order to provide revenue for the City of Albany, create jobs, provide for an Albany Bay Trail, and allow Albany waterfront access?" The added language was not necessary to submit the measure to the voters and

served no independent municipal purpose. The language, moreover, had the effect of stating a partisan position on the ballot measure. The use of the adjective "controlled," though relatively innocuous, still represented an apparent attempt to put the proposed games in a favorable light. More seriously, the final phrase overtly endorsed arguments advanced by proponents of the measure.

We consider first the reference to new jobs and municipal revenues to be generated by the cardroom. Respondent maintains that it is beyond argument that the proposed cardroom would have these favorable impacts and the ballot served a public purpose by providing information of such a factual nature to the voters. But opponents maintain that the new jobs and revenues would be associated with other adverse impacts, which the ballot did not mention, including traffic congestion, the absorption of open space into parking lots, a tendency to attract criminal elements and drunk drivers, the creation of a visual eyesore, and an unhealthy financial dependence of city government on gambling.

We agree that, by selectively mentioning two favorable impacts without mentioning possible adverse impacts, the ballot language had the effect of stating a partisan position favoring proponents of the measure. The language in fact reflected the arguments in favor of the measure which immediately followed in the official ballot pamphlet, giving them added credence.

The language saying that the measure would "provide for an Albany Bay Trail, and allow Albany waterfront access" also entered a controversial area. Proponents of the measure viewed provisions for open space and public access in the development agreement as significant features of the agreement which should be disclosed in any balanced description. As noted earlier, the development agreement committed Ladbroke to take a series of actions to establish a segment of a proposed Bay Trail, adjacent to protected areas of open space, which would enjoy public access and be linked to a planned East Bay Park. Specifically, Ladbroke agreed to use its "best efforts" to purchase and donate to the City a Bay Trail easement 14 feet in width extending for about a mile within the municipal limits of Albany and Berkeley or, alternatively, to reimburse Albany for the cost of acquiring by eminent domain the portion within its municipal limits; to contribute $500,000 for development of the trail; to dedicate a leasehold easement between 1 and 20 feet in width as a buffer zone with a guarantee of at least 1.75 acres of buffer in a "beach" area; to dedicate a 2-acre conservation easement in an area adjacent to a marsh; to release its leasehold interest to a small "plateau" area; and to assure public access to the trail and adjacent lands through a parking lot and access road.

Opponents of the measure argued that the small amount of land to be donated was not compatible with larger plans for an Eastshore Regional Park. The advanced planning manager for the East Bay Regional Park District recommended a 50-foot corridor and the dedication of certain specific areas of ecological significance. A memorandum circulated by the Berkeley Planning Department complained that the agreement "essentially precludes any efforts to realize the original vision" of a state park from Emeryville to Richmond which the city councils of Emeryville, Berkeley and Albany had jointly approved three years earlier. A minority report of the Albany Waterfront Committee expressed similar views. The rebuttal to the ballot argument in favor of Measure F suggested that these shortcomings would be aggravated by increased traffic and crime: "Crime and traffic shut out children and inhibit park development."

In short, while proponents viewed the proposal as a means to create a segment of the Bay Trail with public access and adjacent open space, opponents discounted the significance of these short-term gains and viewed the proposal as an obstacle to the realization of long-term plans for open space and public access. By describing the measure as a means to "provide for an Albany Bay Trail, and allow Albany waterfront access," the ballot language favored the perspective of the proponents of the measure.

Government action which may tend to influence the outcome of an election operates in an area protected by the guarantee of equal protection and freedom of speech. The leading California decision, *Stanson* v. *Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1], concerned the use of public funds in election campaigns. Upholding a complaint alleging that the Director of the State Department of Parks and Recreation made an improper expenditure to promote a bond measure, the court observed, "A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office (see, e.g., Madison, The Federalist Papers, Nos. 52, 53; 10 Richardson, Messages and Papers of the Presidents (1899) pp. 98-99 (President Jefferson)); the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." (*Id.* at p. 217.)

"The importance of governmental impartiality in electoral matters" similarly finds expression in decisions prohibiting the preferential identification

of incumbents on the ballot as violating the guarantee of equal protection. (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 219.) In *Gould* v. *Grubb* (1975) 14 Cal.3d 661 [122 Cal.Rptr. 377, 536 P.2d 1337], the court invalidated a municipal ordinance granting the top positions on the election ballot to incumbents seeking reelection. Again, in *Rees* v. *Layton* (1970) 6 Cal.App.3d 815, 823 [86 Cal.Rptr. 268], the court held unconstitutional an ordinance providing nonincumbents cannot have their occupation stated on the ballot while incumbents could be identified as the holder of the elective office.

In closely analogous areas of law, the guarantee of freedom of speech prohibits governmental action favoring a particular political opinion. Thus, our high court has "held on a number of occasions that the First Amendment precludes the government from making public facilities available to only favored political viewpoints; once a public forum is opened, equal access must be provided to all competing factions." (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 219.) Again, the First Amendment prohibits efforts by public officials to manipulate press coverage of municipal affairs by furnishing or withholding information according to the views of a particular news agency or reporter. " 'While public officials need not furnish information, other than public records, to any news agency, a public official may not constitutionally deny to one media access that is enjoyed by other media, because one media is entitled to the same right of access as any other.' [Citations.]" (*Savage* v. *Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 453 [26 Cal.Rptr.2d 305].)

We reach at length the relevant question: Did the ballot language for Measure F substantially comply with the statutory form prescribed by Business and Professions Code section 19819? We hold that it did not. We attach minor importance to the fact the measure was combined with a package of other related measures. Our holding is based rather on the inclusion of language, overtly favoring a partisan position, which implicated interests protected by the constitutional guarantee of equal protection and freedom of expression. The use of the ballot form to favor a particular side in the election directly conflicts with the legislative intent to submit the measure to the voters in a concise and neutral manner. In the present case, the use of partisan language was a sufficiently egregious deviation from the prescribed form to fall outside the limits of substantial compliance.

We conclude that the trial court erred in sustaining the demurrer to the sixth cause of action. Our decision is necessarily confined to a determination of whether the complaint reveals on its face noncompliance with Business and Professions Code section 19819. We express no opinion as to the merits

of this cause of action since factual issues remain to be decided concerning the effect, if any, that the ballot language had on the election results. (See *Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 126 [89 Cal.Rptr. 601, 474 P.2d 417].)

F.   *California Constitution article II, section 12*

■   Appellant claims that Measure F violated the California Constitution by referring specifically to Ladbroke Racing Corporation. Article II, section 12 of the Constitution provides: "No amendment to the Constitution, and no statute proposed to the electors by the Legislature or by initiative, that names any individual to hold any office, or names or identifies any private corporation to perform any function or to have any power or duty, may be submitted to the electors or have any effect." Measure F asked for voter approval of a gaming ordinance, authorization of gaming within the City, zoning amendment, and development agreement which were incorporated by reference into proposed ordinance No. 94-011. Section 3 of the ordinance referred specifically to the development agreement between the City and "Ladbroke Racing California, Inc., for a Ladbroke gaming facility." The development agreement itself, which was printed in the voter's pamphlet as an attachment to ordinance No. 94-011, names Ladbroke repeatedly as a party to the agreement.

Appellant construes article II, section 12 of the California Constitution as being sufficiently broad to encompass Measure F. Since ordinance No. 94-011 incorporates by reference the development agreement, which identifies a private corporation, i.e., Ladbroke, and confers on it various functions, powers and duties, appellant maintains that the ordinance violates the constitutional provision.

Subsequent to close of briefing, but prior to oral argument, *Pala Band of Mission Indians* v. *Board of Supervisors* (1997) 54 Cal.App.4th 565 [63 Cal.Rptr.2d 148] was decided by Division One of the Fourth District. The court in *Pala* determined that article II, section 12 of the California Constitution was applicable to a voter-approved initiative in San Diego County. We invited the parties to submit briefing on the effect, if any, that *Pala* had on the issues before us. They have done so.

Appellant urges that we extend the *Pala* decision to Measure F. Measure F, however, did not involve the initiative process. An initiative measure is rooted in the "power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." (Cal. Const., art. II, § 8, subd. (a).) Measure F did not originate as a proposal from the electors. As we have

previously seen, the land use provisions in Measure F had their origins with the city council and were required to be submitted to a vote of the people in accordance with the provisions of Measure C.

Measure C represents the essence of home rule. Its purpose is to give the electorate power to control development in an area which it has determined to be "of great significance to the future revenues and financial obligations of the City, as well as to the enjoyment of the City by its citizens." The citizens of Albany reserved the right to approve development agreements for the waterfront area without resort to the initiative or referendum process provided for in the Constitution. We note that it would be difficult, if not impossible, to draft a meaningful ballot measure involving a development agreement without some reference to the parties to that agreement. We find therefore that Measure F was not the type of ballot proposition that is covered by the prohibitions in article II, section 12 of the California Constitution.[11]

## DISPOSITION

The judgment on the first and sixth causes of action is reversed. In all other respects, the judgment is affirmed. The matter is remanded to the trial court for further proceedings consistent with this opinion. Costs to appellant.

Strankman, P. J., and Dossee, J., concurred.

A petition for a rehearing was denied September 2, 1997, and the petition of both respondent City of Albany and real parties in interest for review by the Supreme Court was denied November 12, 1997.

---

[11]Our conclusion makes it unnecessary to address respondent's contention that article II, section 12 of the California Constitution has no application to a charter city.