Filed 4/8/24; Modified and Certified for Pub. 4/30/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUTTER'S PLACE, INC.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA GAMBLING CONTROL COMMISSION,<br><br>Defendant and Respondent. | A168427<br><br>(San Francisco City & County Super. Ct. No. CPF-23-518029) |

Sutter's Place, Inc. (Sutter), which operates a cardroom in San Jose, unsuccessfully sought a writ of mandate in the San Francisco County Superior Court seeking to compel the California Gambling Control Commission (the Commission) to grant Sutter's application for an increase in the number of gambling tables permitted in its cardroom from 49 to 64.[1]

---

[1] All undesignated statutory references are to the Business and Professions Code. Venue in this case is governed by section 19807, which is part of the Gambling Control Act (GCA) (§ 19800 et seq.). Section 19807 provides, inter alia, that "whenever the . . . commission is a defendant or respondent in any proceeding . . . , venue for the proceeding shall be in the County of Sacramento, the City and County of San Francisco, the County of Los Angeles, or the County of San Diego."

All undesignated statutory references are to the Business and Professions Code.

In April 2023, the Commission denied Sutter's application for more tables after concluding the San Jose ballot measure purporting to authorize the increase (Measure H) did not comply with the requirements of the GCA, specifically section 19961, subdivision (c) (section 19961(c)), a provision governing the proper text of local ballot measures authorizing expansions of gambling. Seeing no error, the superior court denied writ relief.

Sutter now appeals,[2] advancing the following three arguments: (1) Recent state legislation validates San Jose's ordinance and abrogates the Commission's decision denying permission to expand; (2) the Commission lacks authority to deny a gambling expansion application on the ground that a local authorizing measure fails to comply with state law; and, alternatively, (3) Measure H substantially complied with section 19961(c), and even if it did not, any defect in the form of Measure H provided no basis for the Commission to deny Sutter's application.

We reject each argument and conclude the trial court did not err in denying Sutter's writ petition. We therefore affirm.

## I. BACKGROUND

### A. *The GCA and Its Limits on Local Expansions of Gambling*

As the parties note, the cardroom that Sutter operates (Bay 101 Casino) is one of two licensed cardrooms in San Jose. (See *Sutter's Place I*, *supra*, A163287; see also S.J. Mun. Code, § 16.04.020, subd. (B) [authorizing

---

[2] As we discuss further below, this is not Sutter's first appeal arising from its effort to add card tables. In an earlier appeal, Division Two of this court, in an unpublished opinion, affirmed the trial court's denial of a writ petition that Sutter filed after the Commission denied its prior application to add tables. (*Sutter's Place, Inc. v. California Gambling Control Commission* (June 14, 2022, A163287) [nonpub. opn.] (*Sutter's Place I*).) We grant Sutter's unopposed request that we take judicial notice of appellate briefs that were filed in *Sutter's Place I*.

2

a maximum of two cardrooms in the city].) Sutter is subject to the GCA and to the regulatory authority of both the Commission and the Department of Justice's Bureau of Gambling Control (the Bureau). (§§ 19811, 19824, 19826; *Swallow v. California Gambling Control Com.* (2022) 77 Cal.App.5th 1037, 1041 (*Swallow*) [responsibilities of the Commission and the Bureau]; see *Sutter's Place I*, *supra*, A163287.)

The GCA was enacted in 1997, and it became effective January 1, 1998. (Stats. 1997, ch. 867; § 19800 et seq.) In enacting this measure, the Legislature declared that "[u]nregulated gambling enterprises are inimical to the public health, safety, welfare, and good order." (§ 19801, subd. (d).) The Legislature also declared, "Public trust and confidence can only be maintained by strict and comprehensive regulation of all persons, locations, practices, associations, and activities related to the operation of lawful gambling establishments . . . ." (*Id.*, subd. (h).) The GCA "is an exercise of the police power of the state for the protection of the health, safety, and welfare of the people of the State of California, and shall be liberally construed to effectuate those purposes." (§ 19971.)

As to local gambling ordinances, section 19960 states: "This chapter [i.e., the GCA, which constitutes Chapter 5 of Division 8 of the Business and Professions Code] shall not prohibit the enactment, amendment, or enforcement of any ordinance by any city, county, or city and county relating to licensed gambling establishments *that is not inconsistent with this chapter*." (§ 19960, italics added.) Among the provisions that explain what *is* inconsistent with the GCA are sections 19961 and 19962, which set forth limits on the authority of local governments to authorize or expand gambling.

Section 19961 requires voter approval for certain types of increases in permitted gambling. Subdivision (a)(1) of section 19961 provides: "Except as

3

provided in paragraph (2), on or after the effective date of this chapter, any amendment to any ordinance that would result in an *expansion of gambling* in the city, county, or city and county, shall not be valid unless the amendment is submitted for approval to the voters of the city, county, or city and county, and is approved by a majority of the electors voting thereon." (§ 19961, subd. (a)(1), italics added.)

To give meaning to the phrase "expansion of gambling," the GCA uses a benchmark in time. "For the purposes of this article [i.e., Article 13 of Chapter 5 of Division 8 of the Business and Professions Code], 'expansion of gambling' means, *when compared to that authorized on January 1, 1996*, or under an ordinance adopted pursuant to subdivision (a) of Section 19960,[3] whichever is the lesser number, a change that results in any of the following:

"(1) An increase of 25 percent or more in the number of gambling tables in the city, county, or city and county.

"(2) An increase of 25 percent or more in the number of licensed card rooms in the city, county, or city and county.

"(3) *An increase of 25 percent or more in the number of gambling tables that may be operated in a gambling establishment in the city, county, or city and county*.

"(4) The authorization of any additional form of gambling, other than card games, that may be legally played in this state, to be played at a gambling establishment in the city, county, or city and county.

---

[3] The provision referred to states: "The gambling establishment is located in a city, county, or city and county wherein, after January 1, 1984, an ordinance was adopted by the electors of the city, county, or city and county, in an election conducted pursuant to former Section 19819 of the Business and Professions Code, as that section read immediately before its repeal by the act that enacted this chapter." (§ 19960, subd. (a).)

"(5) An increase of 25 percent or more in the hours of operation of a gambling establishment in the city, county, or city and county." (§ 19961, subd. (b), italics added.)[4]

Section 19961(c)—the central provision at issue here—governs the form required for gambling-expansion ballot measures that are submitted to voters. Section 19961(c) states: "The measure to expand gambling shall appear on the ballot in substantially the following form: 'Shall gambling be expanded in ___ beyond that operated or authorized on January 1, 1996, by ___ (describe expansion) Yes ___ No ___.' "[5]

In addition to these rules pertaining to voter approval of gambling expansions, former section 19962, which was in effect until January 1, 2023, prohibited many such increases entirely.[6] (Former § 19962, as amended by

---

[4] Pursuant to section 19961, subdivision (a)(2), a local jurisdiction may authorize—without voter approval—a gambling increase that is smaller in scope than those listed in section 19961, subdivision (b). Section 19961, subdivision (a)(2) states: "Notwithstanding paragraph (1) and Section 19962, an ordinance may be amended without the approval of the electors after the effective date of this chapter to expand gambling by a change that results in *an increase of less than 25 percent* with respect to any of the matters set forth in paragraphs (1), (2), (3), and (5) of subdivision (b). *Thereafter, any additional expansion shall be approved by a majority of the electors voting thereon.*" (§ 19961, subd. (a)(2), italics added; see *id.*, subd. (f).)

[5] As we discuss further below, section 19961.1 provides for preelection review of proposed local ordinance amendments pertaining to gambling. That provision states: "Any amendment to a city or county ordinance relating to gambling establishments, or the Gambling Control Act, shall be submitted to the department [i.e., the Bureau] for review and comment, before the ordinance is adopted by the city or county."

[6] Section 19961, subdivision (d) states the authority of a local government to expand gambling by obtaining voter approval under section 19961(c) is "subject to" the prohibition in section 19962. (§ 19961, subd. (d) ["The authorization of subdivision (c) is subject to Sections 19962 and 19963 until those sections are repealed."].)

Stats. 2018, ch. 744, § 1, and repealed January 1, 2023, by its own terms (former § 19962)). Specifically, former section 19962, subdivision (b) stated: "An ordinance in effect on January 1, 1996, that authorizes legal gaming within a city, county, or city and county may not be amended to expand gaming in that jurisdiction beyond that permitted on January 1, 1996." The parties refer to this prohibition as a "moratorium" on the expansion of gambling in California (although as noted, smaller increases were permitted (§ 19961, subd. (a)(2))).

Former section 19962 was repealed by its own terms as of January 1, 2023. (Former § 19962, subd. (c).) But the Legislature later restored the prohibition on most expansions of gambling, with the passage of Assembly Bill No. 341 (2023–2024 Reg. Sess.) (Assembly Bill 341), which was enacted in May 2023 and took effect on January 1, 2024. (Stats. 2023, ch. 8.) Assembly Bill 341 added a new section 19962, which again prohibits—with an exception that we will discuss below—the expansions of gambling that were prohibited by the former provision. (Stats. 2023, ch. 8, § 2.) Section 19962, subdivision (b)(1) states: "An ordinance in effect on January 1, 1996, that authorizes legal gambling within a city, county, or city and county shall not be amended to expand gambling in that jurisdiction beyond that permitted on January 1, 1996." This new prohibition will remain in effect until January 1, 2043. (§ 19962, subd. (c).)

B. *San Jose's Authorization of Gambling and the Passage of Measure H*

Sutter notes in its writ petition that, on January 1, 1996—which, as we have noted, is a key benchmark date for the GCA's regulation of the amount of gambling in California (§§ 19961, subd. (b), 19962, subd. (b)(1); former § 19962, subd. (b))—the San Jose Municipal Code permitted gambling within specified limits, including that the maximum number of card tables

6

permitted at any one cardroom was 40. A 2010 ballot measure amended the local code to increase the maximum number of tables at each of San Jose's two cardrooms from 40 to 49. That increase was less than 25 percent, so it was permissible under the GCA. (§ 19961, subds. (a)(2), (b)(3); former § 19962, subd. (b).)

On August 10, 2020, the City of San Jose (the City), pursuant to section 19961.1, notified the Bureau that it was planning to amend its municipal code and provided the proposed language of its Measure H, which was intended to increase by 15 the number of gambling tables permitted at each licensed cardroom (from 49 to 64), and to increase by 30 the total number of gambling tables permitted in the City (from 98 to 128). The City also proposed to raise taxes on the cardrooms.

The ballot language submitted to the Bureau, which was later presented unchanged to the voters—and which did not reference the 1996 benchmark or mention "gambling" (see § 19961(c))—read as follows: "To fund general San Jose services, including fire protection, disaster preparedness, 911 emergency response, street repair, youth programs, addressing homelessness, and supporting vulnerable residents, shall an ordinance be adopted increasing the cardroom tax rate from 15% to 16.5%, applying the tax to third party providers at these rates: up to $25,000,000 at 5%; $25,000,001 to $30,000,000 at 7.5%; and over $30,000,000 at 10%, increasing card tables by 30, generating approximately $15,000,000 annually, until repealed? Yes ___ No ___."

On October 19, 2020, the Bureau provided written comments to the City and stated the expansion of gambling under Measure H (specifically the increased number of tables per cardroom) was inconsistent with the GCA because former section 19962 at that time prohibited the proposed expansion.

7

The Bureau also stated the language of Measure H appeared to be inconsistent with the GCA because it did not comply with section 19961(c). In particular, the Bureau noted the "proposed ballot measure describes the gambling expansion," but "it does not indicate that the expansion is beyond that operated or authorized on January 1, 1996." In addition, the Bureau stated the language about increasing card tables by 30 "is vague as it may refer to the overall number of card tables allowed in the City or the number of card tables allowed per cardroom in the City."

Despite the Bureau's response, the City held its special election on November 3, 2020, and the voters approved Measure H. On February 1, 2021, the San Jose City Council adopted Ordinance No. 2020.1, amending San Jose Municipal Code section 16.04.020 to increase the maximum number of card tables in the City to 128 and the maximum number of card tables for any one cardroom to 64. (S.J. Mun. Code, § 16.04.020, subds. (A), (C).)

## C. *Sutter's First Application To Operate 64 Gambling Tables and the Resulting Litigation* (Sutter's Place I)

Following the passage of Measure H, Sutter submitted an application to increase the number of gambling tables at its cardroom from 49 to 64, and the Commission denied that application in April 2021. (*Sutter's Place I, supra*, A163287.) The Commission denied the application because it concluded the requested increase exceeded the number of tables permitted by the GCA. (*Sutter's Place I, supra*, A163287.) Sutter petitioned the trial court for a writ of mandate directing the Commission to set aside its decision. (*Ibid*.) The trial court denied the petition, and on Sutter's appeal, Division

8

Two of this court affirmed in an unpublished opinion in June 2022. (*Sutter's Place I*, *supra*, A163287.)[7]

The trial and appellate courts in *Sutter's Place I* concluded that (1) on January 1, 1996 (the benchmark date under the GCA for proposed increases in gambling), the San Jose municipal code allowed a maximum of 40 tables per cardroom; (2) a 2010 ordinance increased the maximum to 49 tables per cardroom (an increase that was less than 25 percent and therefore did not run afoul of the limits in the GCA) (§ 19961, subds. (a)(2), (b)(3); former § 19962, subd. (b)); and (3) the requested increase to 64 tables per cardroom *would* represent more than a 25 percent increase over the 40-table benchmark (and, for that matter, over the newer total of 49) and therefore was prohibited under section 19961, subdivision (b)(3) and former section 19962, subdivision (b). (*Sutter's Place I*, *supra*, A163287.) Sutter's application therefore was inconsistent with state law. (*Ibid.*)

In the *Sutter's Place I* litigation, Sutter argued the increase to 64 tables per cardroom was a permissible increase relative to the January 1, 1996 benchmark, because on that date a San Jose code provision had allowed the licensing of up to 181 card tables in the City as a whole. (*Sutter's Place I*, *supra*, A163287.) The *Sutter's Place I* court rejected that argument, holding in part that the more specific municipal code section in effect on January 1,

---

[7] Garden City, Inc. (Garden City), which operates Casino M8trix, the other licensed cardroom in San Jose, also applied to the Commission to increase its permitted number of tables from 49 to 64, and the Commission denied its application as well. Sutter's position was also informally supported by the City of San Jose during the administrative proceedings. (*Sutter's Place I*, *supra*, A163287.) In *Sutter's Place I*, the appellate court stated that Sutter's "informal alliance" with the City of San Jose and with Garden City "continued in proceedings before the superior court" but it "dissolved when Sutter pressed on with [its] appeal." (*Ibid.*)

1996 unambiguously provided that no cardroom could be issued a permit for more than 40 tables.  (*Ibid.*)

In connection with this issue, the appellate court in *Sutter's Place I* rejected Sutter's contention that the court "should defer to the manner in which San José interprets and applies [its] ordinances."  (*Sutter's Place I, supra*, A163287.)  The court noted that "Sutter's is in the unusual position of arguing on behalf of an entity that is no longer a party and is not participating in this appeal.  Most importantly, the subject is not technical, but pure judicial construction of legal texts, where courts do not defer." (*Ibid.*)

Finally, the court emphasized that deference to a local government's purported view was inappropriate in the context of the state's regulation of gambling.  (*Sutter's Place I, supra*, A163287.)  The court stated:  "[G]iving deference to the City's claimed construction of its own ordinances would seriously unbalance the inquiry before us.  The City's ordinances do not exist in isolation from the state statutes that define the scope of the City's discretion, which is limited to whether or not to legislate as permitted by state law.  Viewed in the cold light of day, the claim of deference would allow a city, county, or city and county to flout state law at its pleasure.  Such a view of municipal power under the Gambling Control Act cannot be entertained." (*Ibid.*)

### D. *Sutter's Second Application and the Present Litigation*

On November 1, 2022, Sutter submitted another application to the Bureau (the application at issue in this case), asking that the Commission make a decision on the application after January 1, 2023, when the state statutory prohibition on gambling expansion in former section 19962, subdivision (b) was set to expire.  In its application, Sutter again requested

an increase of 15 permanent gambling tables (from 49 to 64), based on the local code amendment that followed the passage of Measure H.

The Bureau investigated the application and, on January 25, 2023, presented its findings to the Commission. The Bureau did not make a recommendation as to whether the Commission should grant or deny the application. But the Bureau pointed out that, while the "moratorium" in former section 19962, subdivision (b) had expired, the process requirements for approving local ordinance amendments—including section 19961(c)'s specification as to ballot language—remained in effect. Based on the Bureau's report, the Commission's staff recommended the Commission deny the application.

The Commission heard arguments and comments on Sutter's application at Commission meetings on March 23, 2023, and April 20, 2023. The Commission denied the application at the conclusion of the April 20, 2023 meeting, and memorialized its decision in a letter to Sutter on April 21, 2023.

On April 25, 2023, Sutter filed in the trial court a petition for a writ of mandate under Code of Civil Procedure section 1085. Sutter then filed a motion for a writ of mandate in July 2023, which the Commission opposed. Garden City, which had also submitted an application for 15 additional tables that was denied by the Commission at the same time as Sutter's application, filed a brief in support of Sutter's motion.

After holding a hearing on August 2, 2023, the trial court denied Sutter's motion for a writ. The court rejected Sutter's argument that the Commission lacked authority to deny its application on the ground Measure H did not comply with section 19961(c). Summarizing the parties' positions, the court stated Sutter "believes that [the Commission] only had

11

authority to deny [Sutter's] application based on the grounds enumerated in" a regulation (Cal. Code Regs., tit. 4, § 12472, subd. (b)) (a provision we discuss below), while the Commission "argues that its jurisdiction is broader and while it cannot formally invalidate a municipal ordinance, it can make determinations whether the ordinance is consistent with the [GCA]." The Commission also asserted that *Sutter's Place I* "already resolved this issue," so principles of issue preclusion barred the parties from relitigating it.

The trial court first concluded issue preclusion applied to the question of the Commission's authority. The trial court stated that in *Sutter's Place I*, the appellate court "concluded that [the Commission] had the ability to determine whether municipal action is consistent with state law. That is the precise issue in this case." The trial court also found that, even if issue preclusion did not apply, the Commission did not abuse its discretion or exceed its authority by denying Sutter's application. The trial court held that, under the GCA, "[w]hile local entities have power in regulating gambling (see [§ 19801, subd. (l)]), the City of San Jose does not have plenary authority to promulgate ordinances inconsistent with state law." The trial court stated: "The court concludes that as the agency in charge of regulating gambling, [the Commission] had the authority to refuse an application that conflicted with state law."

Turning to San Jose's Measure H (which purportedly authorized the additional gambling tables sought in Sutter's application), the court found the measure's ballot language did not substantially comply with section 19961(c). The court stated its view that "the [ballot measure's] failure to refer to the 1996 benchmark [specified in § 19961(c)'s form language] was somewhat understandable since circumstances changed." But the court stated "that failure coupled with the failure to refer to 'gambling' and the

12

inclusion of . . . partisan language rendered the ballot form not substantially compliant."

Finally, the court rejected Sutter's contention that the Commission "improperly overturned the election even though there were no grounds to do so under" Elections Code section 16100. The court explained that the Commission had not overturned the election, but had "merely denied [Sutter's] application for more tables." The court stated that other provisions of Measure H, such as tax increases, "remain enforceable."

Sutter appealed.[8]

## II. DISCUSSION

### A. *Legal Standards*

"To obtain a writ of mandate under Code of Civil Procedure section 1085, the petitioner has the burden of proving a clear, present, and usually ministerial duty on the part of the respondent, and a clear, present, and beneficial right in the petitioner for the performance of that duty." (*Marquez v. State Dept. of Health Care Services* (2015) 240 Cal.App.4th 87, 103.) In addition, section 19804, a provision of the GCA, states a court shall not issue writ relief "except as follows: [¶] (1) Upon proof by clear and convincing evidence that . . . the commission is abusing or threatens to abuse its discretion. [¶] (2) Upon proof by clear and convincing evidence that . . . the commission is exceeding or threatens to exceed its jurisdiction." (§ 19804, subd. (a)(1)–(2).)

When reviewing a trial court's decision on a petition for a writ of mandate, we independently review questions of law, including questions of

---

[8] Although Garden City and the City of San Jose supported Sutter's position in the trial court, they have not submitted (or requested to submit) briefs or otherwise participated in this appeal.

statutory interpretation.  (*Armando D. v. State Dept. of Health Services* (2004) 124 Cal.App.4th 13, 21.)  In construing a statute, "[w]e give the agency's interpretation deference if it is appropriate under the circumstances, such as when the statute is complex or technical.  [Citation.]  While an administrative interpretation of a statute is entitled to great weight, it must be rejected if it is 'erroneous or unauthorized by the applicable laws.'  [Citation.]  We must attempt to harmonize all parts of the statutory and regulatory framework as a whole and avoid an interpretation that would render any part meaningless." (*Swallow, supra,* 77 Cal.App.5th at p. 1045.)

" 'When interpreting statutes, we begin with the plain, commonsense meaning of the language used by the Legislature.  [Citation.]  If the language is unambiguous, the plain meaning controls.  [Citation.]'  [Citation.]  If the language of the statute is ambiguous, a court 'can look to legislative history [citation] and to rules or maxims of construction' to resolve the ambiguity." (*Doe v. Marysville Joint Unified School Dist.* (2023) 89 Cal.App.5th 910, 915–916.)  " ' "As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose." ' " (*New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 795 (*New Cingular*).)

" 'We do not . . . consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes.  [Citation.]  That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes.  [Citation.]  We must harmonize the various parts of the enactments by considering them in the context of the statutory framework as a whole.' " (*New Cingular, supra,* 246 Cal.App.4th at p. 795.)  A statute's legislative

history and the circumstances of its enactment may be considered in ascertaining legislative intent. (*Id.* at p. 798.)

## B. *Assembly Bill 341 Did Not Abrogate the Commission's Decision*

Sutter contends the statutory changes effected by Assembly Bill 341 (which reimposed the prohibition on most gambling expansions) "validates" the San Jose ordinance at issue, thus abrogating the Commission's basis for denying Sutter's application to operate more tables. We reject this argument.[9]

As noted, Assembly Bill 341 (which took effect on January 1, 2024) added a new section 19962, reinstating the moratorium and ending a hiatus that had begun with the automatic repeal of former section 19962 on January 1, 2023. (Stats. 2023, ch. 8, § 2; former § 19962, subd. (c).) Under the current statutory scheme, subdivision (b)(1) of section 19962 prohibits amendments of local ordinances to expand gambling beyond that permitted on January 1, 1996, while subdivision (b)(2) states an exception to that prohibition for an ordinance that, among other conditions, "became operative on January 1, 2023," as the result of the expiration of the previous moratorium. Section 19962, subdivision (b)(1)–(2) provides:

"(1) An ordinance in effect on January 1, 1996, that authorizes legal gambling within a city, county, or city and county shall not be amended to

---

[9] When the trial court ruled on Sutter's writ petition in August 2023, Assembly Bill 341 had been enacted but had not yet taken effect. (Stats. 2023, ch. 8.) In a brief filed in the trial court in support of Sutter's position, Garden City raised the argument based on Assembly Bill 341 that Sutter now raises on appeal. Sutter does not contend that it raised this argument in the trial court, and the trial court's order does not address it. We nevertheless review the point, as it presents a legal question and has been fully briefed on appeal.

15

expand gambling in that jurisdiction beyond that permitted on January 1, 1996.

"(2) *Notwithstanding paragraph (1)*, an ordinance that was approved by a majority of the voters in a city, county, or city and county in an election that occurred after November 1, 2020, that authorizes an increase in the number of gambling tables at a gambling establishment, and that became operative on January 1, 2023, as the result of the repeal of former Section 19962, as amended by Chapter 1 of Section 744 of the Statutes of 2018, *shall continue to be valid on and after January 1, 2024*." (§ 19962, subd. (b)(1)–(2), italics added.)

Sutter argues the San Jose ordinance here (S.J. Ord. No. 2020.1, which amended S.J. Mun. Code, § 16.04.020)[10] meets the criteria in section 19962, subdivision (b)(2) and therefore has been deemed valid, obviating any question about whether the Measure H ballot language submitted to voters complied with section 19961(c). We disagree. Although the ordinance appears to fall within the terms of section 19962, subdivision (b)(2),[11] we read that provision as establishing an exception to the new moratorium in subdivision (b)(1) of section 19962, not as a broad pronouncement that a covered ordinance is deemed valid without regard to whether it complies with other provisions of the GCA.

---

[10] As noted, after the voters approved Measure H on November 3, 2020, the San Jose City Council adopted Ordinance No. 2020.1 on February 1, 2021, amending section 16.04.020 of the San Jose Municipal Code to increase the maximum number of tables.

[11] Measure H was approved by voters after November 1, 2020, and authorized more tables per gambling establishment. Although the change to municipal law may have taken effect shortly thereafter, it arguably did not become operative until January 1, 2023, when the previous moratorium was repealed. (Former § 19962, subd. (c).)

Section 19962, subdivision (b)(2) states that, "*[n]otwithstanding paragraph (1)*" of the subdivision (i.e., the new moratorium on gambling expansions), a covered ordinance "shall continue to be valid on and after January 1, 2024" (i.e., when the new moratorium takes effect). (§ 19962, subd. (b)(2), italics added.) The phrase "shall continue to be valid" is a tip-off the Legislature had in mind only ordinances that complied with all other requirements of state law and that would have been valid but for the moratorium. The Legislature could have used broader language, such as stating a covered ordinance is to be deemed valid "notwithstanding any other provision of law," but it chose to draft section 19962, subdivision (b)(2) more narrowly.

As we read it, section 19962, subdivision (b)(2) provides that a covered ordinance is *not rendered invalid* by subdivision (b)(1)'s new moratorium, i.e., the statute states a general rule (the new moratorium) and an exception to that rule. Section 19962, subdivision (b)(2) does not exempt a local ordinance from other requirements of state law. (See § 19960 [local ordinances relating to gambling are permitted if they are "not inconsistent with" the GCA].) Other state law defects with Measure H are not retroactively cured, and specifically the Commission's determination that the ordinance failed to comply with section 19961(c) has not been abrogated by statute.

In its appellate reply brief, Sutter cites legislative history materials that it claims provide evidence that the section 19962, subdivision (b)(2) exception to the moratorium was added to validate the San Jose ordinance.[12]

---

[12] Sutter also asserts in its reply brief that the San Jose ordinance is "the only one in the state that satisfies the criteria of" section 19962, subdivision (b)(2). In its opening brief, Sutter presented a more generic argument, suggesting Assembly Bill 341 confers validity on "any ordinance to which it applies."

We think the meaning of section 19962, subdivision (b)(2) is clear from its language, without a need to consider legislative history. But even if it were necessary to consider the legislative history of Assembly Bill 341, and even assuming Sutter has properly raised this point in reply, we are not persuaded by Sutter's legislative history argument. The legislative materials it cites (as well as others it omitted), while referring to San Jose's ordinance, confirm our conclusion that section 19962, subdivision (b)(2) establishes only that the ordinance is not rendered invalid by the new moratorium on gambling expansions; the ordinance is not exempted from compliance with other GCA provisions.

Sutter cites two bill analyses that were prepared in March 2023. By dint of timing, these analyses make no mention of the Commission's later denial of Sutter's expansion application in April 2023. (Assem. Com. on Governmental Organization, Analysis of Assem. Bill. No. 341 (2023–2024 Reg. Sess.) as introduced Jan. 30, 2023, p. 5 (Assembly committee analysis); Assem., 3d reading analysis of Assem. Bill. No. 341 (2023–2024 Reg. Sess.) as amended Mar. 15, 2023, pp. 3–4 (Assembly 3d reading analysis).)[13] Instead, the cited analyses (1) refer to the Commission's denial of Sutter's and Garden City's earlier applications based on the moratorium that was then in effect, and (2) state that a provision in Assembly Bill 341 (which apparently became § 19962, subd. (b)(2)) would allow for the implementation of Measure H, which had not been possible while the previous moratorium was in effect.

_____

[13] The Assembly committee analysis is dated March 8, 2023, and the Assembly third reading analysis is dated March 22, 2023. (California Legislative Information website, Bill Analyses for Assembly Bill No. 341 (2023–2024 Reg. Sess.), at <https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=2023 20240AB341> [as of Apr. 8, 2024].)

18

(Assembly committee analysis, *supra*, at p. 5; Assembly 3d reading analysis, *supra*, at pp. 3–4.)

Specifically, the Assembly committee analysis states (in language that is largely repeated in the Assembly third reading analysis): "The general reasoning behind this provision is to resolve an outstanding issue relating to the City of San Jose's cardroom gaming operations. AB 341 would allow for the implementation of a previous local ballot measure (Measure H of 2020) that was approved (72.63% to 27.37%) by San Jose voters but could not be implemented due to the legality of the previous statewide gaming moratorium that expired on January 1, 2023. Measure H allows local cardrooms (Bay 101 and Casino M8trix) to increase the number of gaming tables (15 more per cardroom) if they pay the city more in annual taxes from gaming operations to fund general services, such as fire protection, 911 emergency response, public safety, street repair, and addressing homelessness. The [Commission] ruled that both of the city's card rooms had already reached the maximum number of tables per card room (49) and any added tables beyond that number would be inconsistent with the Act (previous moratorium)." (Assembly committee analysis, *supra*, at p. 5; see Assembly 3d reading analysis, *supra*, at pp. 3–4.)

The issues that arose following the Commission's April 2023 denial of Sutter's expansion application—which have now made their way to us—were not "outstanding" when the March 2023 committee analysis was prepared. We believe the reference to "an outstanding issue relating to the City of San Jose's cardroom gaming operations" reflects a recognition that the basis for the Commission's *earlier* denial (the previous moratorium) no longer existed after January 1, 2023, and expressed an intent that the new moratorium would not prevent Measure H from taking effect. But that comment does not

19

address whether Measure H complies with other provisions of the GCA, such as the ballot language provision in section 19961(c).

Subsequent legislative analyses confirm the only expressed intent was to clarify that Measure H falls within an exception *to the new moratorium*, not to address whether it complies with other state statutory provisions. Senate analyses that were issued in April and May 2023 refer to the Commission's denial of Sutter's and Garden City's more recent applications (based on Measure H's ballot language) and do not take a position on the correctness of that ruling, much less suggest an intent to override it. (Sen. Com. on Governmental Organization, Analysis of Assem. Bill No. 341 (2023–2024 Reg. Sess.) as amended Mar. 15, 2023, p. 5 (Senate Governmental Organization Committee analysis); Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 341 (2023–2024 Reg. Sess.) as amended Apr. 27, 2023, pp. 4–5 (Senate Rules Committee analysis).)[14]

The Senate analyses note that the Commission addressed this issue at a March 23, 2023 meeting (where the ballot language issue was discussed) and then again at a meeting on April 20, 2023, where the applications were denied. (Senate Governmental Organization Committee analysis, *supra*, at p. 5; Senate Rules Committee analysis, *supra*, at pp. 4–5.) The Senate Governmental Organization Committee analysis states (in language largely echoed by the Senate Rules Committee analysis): "On April 20, 2023, the Commission denied the increase in tables for both Bay 101 and Casino M8trix on a 4-1 vote. Discussion regarding the reason for the denial once

_____

[14] These analyses are dated April 21, 2023, and May 10, 2023. (California Legislative Information website, Bill Analyses for Assembly Bill No. 341 (2023–2024 Reg. Sess.), at <https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=2023 20240AB341> [as of Apr. 8, 2024].)

20

again focused on the discrepancy in the language of Measure H compared to the requirements in the Act. Following the denial, both cardrooms have the option of either appealing the decision to the Commission itself or seeking a remedy through the courts. The language in this bill would, *if those tables are eventually approved*, allow both Bay 101 and Casino M8trix to continue to operate those tables." (Senate Governmental Organization Committee analysis, *supra*, at p. 5, italics added; see Senate Rules Committee analysis, *supra*, at pp. 4–5; see also Assem. Floor Analysis of Assem. Bill No. 341 (2023–2024 Reg. Sess.), as amended Apr. 27, 2023, p. 3 [stating the bill "would grant *an exemption to the reinstated moratorium* contained in this bill, to allow the two cardrooms in San Jose to increase the number of gaming tables at their gambling establishments, as defined and in accordance with the law" (italics added); making no reference to the Commission's denial based on the ballot language of Measure H].)

We conclude the legislative analyses, taken together, reflect an intent that, under Assembly Bill 341, Sutter and Garden City will be able to operate the additional tables *if* they are approved by the Commission or the courts (i.e., the new moratorium will not prevent the operation of the tables). The legislative history materials do not evidence an intent to exempt Measure H from all provisions of the GCA or to determine the outcome of the administrative and judicial review process pertaining to the Commission's more recent denial based on Measure H's ballot language.

## C. *The Commission Had Authority To Deny Sutter's Application Based on Measure H's Noncompliance with Section 19961(c)*

According to Sutter, the Commission lacked authority under the GCA to deny Sutter's application for more tables on the ground that the proposition authorizing more tables—Measure H—failed to comply with section 19961(c). The trial court rejected this argument, holding that "as the

21

agency in charge of regulating gambling, [the Commission] had the authority to refuse an application that conflicted with state law." We agree with the trial court.[15]

The GCA vests the Commission with broad authority to regulate and supervise gambling in California. The Commission has "jurisdiction over operation and concentration, and supervision over gambling establishments in this state and over all persons or things having to do with the operations of gambling establishments . . . ." (§ 19811, subd. (b); *Swallow, supra,* 77 Cal.App.5th at p. 1041.) Section 19824 provides that the Commission "shall have all powers necessary and proper to enable it fully and effectually to carry out the policies and purposes of [the GCA], including, without limitation, the power to do all of the following: [¶] . . . [¶] (b) For any cause deemed reasonable by the commission, deny any application for a license, permit, or approval provided for in this chapter or regulations adopted pursuant to this chapter, limit, condition, or restrict any license, permit, or approval, or impose any fine upon any person licensed or approved. . . . [¶] . . . ."

Despite the Commission's broad statutory authority, Sutter contends a Commission regulation that governs applications to operate additional tables[16]—California Code of Regulations, title 4, section 12472—prevents the Commission from considering whether an application conflicts with state law. We disagree.

---

[15] Because we conclude the Commission had authority under the GCA to deny Sutter's application, we need not address the parties' arguments as to whether, under principles of issue preclusion, the appellate decision in *Sutter's Place I* bars Sutter from litigating the authority issue.

[16] The Commission has authority to "adopt regulations for the administration and enforcement of" the GCA. (§ 19840; see § 19841.)

22

California Code of Regulations, title 4, section 12472 specifies the application form to be submitted to the Bureau.  (Cal. Code Regs., tit. 4, § 12472, subd. (a).)  The Bureau is to review the application and submit its findings to the Commission, which will then consider the request.  (*Id.*, subd. (d).)  Subdivision (b) of the regulation states the Commission "will not grant" an application in certain circumstances:  "The Commission will not grant the application if any of the following are disclosed by the application or the results of the investigation of the applicant by the Bureau:  [¶] (1) The requested increase in the number of tables would exceed the number of tables allowed to be operated by the local jurisdiction for either the particular cardroom or the jurisdiction in which the gambling establishment is located. [¶] (2) The requested increase in the number of tables has been denied by the local jurisdiction in which the gambling establishment is located. [¶] (3) The gambling establishment's cardroom business license is suspended or is subject to conditions precluding the approval of an increase in the number of tables. [¶] (4) The gambling establishment has outstanding fees, deposits, fines, or penalties owing to the Commission or to the Bureau."  (Cal. Code Regs., tit. 4, § 12472, subd. (b).)

Sutter argues that the regulation states an exclusive list of the grounds on which the Commission may deny an application to operate more tables, and that none of those grounds applies here, so the Commission could not consider whether Measure H's purported authorization for the added tables complied with section 19961(c).  We do not agree the regulation limits the Commission's authority in this way.

In our view, the statement in California Code of Regulations, title 4, section 12472, subdivision (b) that the Commission "will not grant" an application to operate more tables in certain circumstances—including where

23

local authorities have not approved the tables, the applicant's license has been suspended, or the applicant has outstanding fees—should not be read as a conclusive and exclusive determination by the Commission that these are the only grounds on which it may be "reasonable" to deny an application. (§ 19824, subd. (b).) Instead, we consider the regulation in the context of "the statutory and regulatory framework as a whole" (*Swallow*, *supra*, 77 Cal.App.5th at p. 1045), including the GCA's conferral on the Commission of broad authority and responsibility to "carry out" "fully and effectually" the "policies and purposes" of the GCA (§ 19824), as well as the detailed provisions regulating local expansions of gambling (§§ 19960–19966), and the requirement that we liberally construe the GCA to effectuate its purposes (§ 19971). We decline to read the regulation as requiring the Commission to grant an application that conflicts with state law, and we hold the Commission properly could consider whether the table increase requested by Sutter had been properly authorized under section 19961.

In addition, although we need not resolve the point, we find some force to the Commission's argument that one of the grounds for denial that *is* listed in the regulation—that the requested table increase "would exceed the number of tables allowed to be operated by the local jurisdiction for . . . the particular cardroom" (Cal. Code Regs., tit. 4, § 12472, subd. (b)(1))—applies here. Although San Jose amended its municipal code following the passage of Measure H to allow the increased number of tables (S.J. Mun. Code, § 16.04.020, subds. (A), (C)), we do not believe the Commission was required to disregard what it viewed as Measure H's noncompliance with state law, specifically section 19961(c). Where a local jurisdiction's decision to "allow[]" additional tables was not taken in compliance with the GCA, the Commission should be able to deny an application on the ground the requested increase

24

would exceed the number of tables that has been properly or validly "allowed" by the local jurisdiction. (Cal. Code Regs., tit. 4, § 12472, subd. (b)(1).)[17]

Sutter's remaining arguments as to the scope of the Commission's authority are not persuasive. Sutter cites sections 19801, subdivision (l) and 19841, subdivision (p) to argue that local governments may regulate the number of tables a cardroom may have and that the Commission has "only a minor gap-filling role" to play. Those provisions are inapposite and do not limit the Commission's authority to deny an application to operate more tables where the proposed increase would violate state law.

Under sections 19801, subdivision (l) and 19841, subdivision (p), local governments may regulate certain matters, including the number of tables in a gambling establishment, and the Commission may regulate those topics if local regulation is inadequate.[18] Relying on those provisions, Sutter argues

---

[17] Here, the Commission concluded Measure H did not comply with the ballot language requirements in section 19961(c). But we note that, under Sutter's interpretation of California Code of Regulations, title 4, section 12472, subdivision (b), the Commission also would be required to grant an application if a local government's decision to allow more tables was inconsistent with other applicable provisions of the GCA, such as if a city council approved an expansion of gambling without submitting it to the voters at all. (§ 19961, subds. (a)(1) ["any amendment to any ordinance that would result in an expansion of gambling" in the local jurisdiction "shall not be valid" unless it is approved by the voters], (b).) Indeed, applying the logic of Sutter's position, the Commission would have to grant an application even if a local measure allowed an expansion of gambling that was prohibited by the statutory moratorium in section 19962, subdivision (b)(1) or former section 19962, subdivision (b).

[18] Section 19801, a provision setting forth legislative findings and declarations, states in subdivision (l): "The location of lawful gambling premises, the hours of operation of those premises, *the number of tables permitted in those premises*, and wagering limits in permissible games conducted in those premises are proper subjects for regulation by local

25

the Commission could only deny its application to operate more tables if "local rules [were] not sufficiently protective of citizens' health, safety, or welfare." We disagree. As the trial court noted, the power local entities have to regulate gambling does not give them "plenary authority to promulgate ordinances inconsistent with state law." (See § 19960 [GCA does not prohibit local ordinances that are "not inconsistent with" the GCA].) And the GCA's provisions regulating expansions of gambling refute any notion the number of tables is exclusively a matter of local concern. (§§ 19961, 19961.06, 19961.07, 19962.) The Commission may apply governing state law when deciding whether to grant an application to operate more tables.

Sutter next contends that the Commission lacks statutory authority to "invalidate" a ballot measure or "adjudicate [its] validity," and that only courts can do so. But as the trial court noted, the Commission "merely denied [Sutter's] application for more tables," and "Measure H's tax increases, etc. remain enforceable." As we discuss further in part II.E, *post*, we agree with the trial court that the Commission did not seek to overturn the election. Instead, the Commission just considered whether Sutter's application for more tables was consistent with state law governing expansions of gambling

---

governmental bodies. However, consideration of those same subjects by a state regulatory agency, as specified in this chapter, is warranted when local governmental regulation respecting those subjects is inadequate or the regulation fails to safeguard the legitimate interests of residents in other governmental jurisdictions." (§ 19801, subd. (l), italics added.)

Section 19841 states "[t]he regulations adopted by the commission shall do all of the following: [¶] . . . [¶] (p) Define and limit the area, games, hours of operation, *number of tables*, wagering limits, and equipment permitted, or the method of operation of games and equipment, if the commission, upon the recommendation of, or in consultation with, the department, determines that local regulation of these subjects is insufficient to protect the health, safety, or welfare of residents in geographical areas proximate to a gambling establishment." (§ 19841, subd. (p), italics added.)

(a determination that is subject to judicial review). For the reasons we have discussed above, we conclude it acted properly in doing so.

### D. *Measure H Did Not Substantially Comply with Section 19961(c)*

Because Measure H proposed to increase the number of gambling tables at each of San Jose's two cardrooms to 64 (an increase of more than 25 percent over the 40 tables permitted on January 1, 1996),[19] the increase was an "expansion of gambling" that had to be approved by voters in an election complying with section 19961. (§ 19961, subds. (a)(1), (b)(3); § 19961(c).) As noted, section 19961(c) states: "The measure to expand gambling shall appear on the ballot in substantially the following form: 'Shall gambling be expanded in ___ beyond that operated or authorized on January 1, 1996, by ___ (describe expansion) Yes ___ No ___.' "

In contrast to this concise, neutral language, Measure H stated: "To fund general San Jose services, including fire protection, disaster preparedness, 911 emergency response, street repair, youth programs, addressing homelessness, and supporting vulnerable residents, shall an ordinance be adopted increasing the cardroom tax rate from 15% to 16.5%, applying the tax to third party providers at these rates: up to $25,000,000 at 5%; $25,000,001 to $30,000,000 at 7.5%; and over $30,000,000 at 10%, increasing card tables by 30, generating approximately $15,000,000 annually, until repealed? Yes ___ No ___."

As the trial court noted, some deviations from a prescribed ballot form are permissible (*Schauer v. Peek* (1942) 20 Cal.2d 681, 684), but substantial compliance is required, and partisan language can render a ballot form

---

[19] As noted, a 2010 ballot measure amended the local code to increase the number of tables allowed at each of San Jose's two cardrooms from 40 to 49. That increase was less than 25 percent, so it was permissible under the GCA. (§ 19961, subds. (a)(2), (b)(3); former § 19962, subd. (b).)

27

improper (*Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199, 1225, 1228 (*Citizens*)). What we have here cannot fairly be characterized as a mere "deviation" from the statutorily prescribed form. If the question Measure H put to the voters were posed in a courtroom cross-examination, the question would be objectionable as argumentative, not to mention vague and lacking in foundation. The trial court correctly concluded Measure H did not substantially comply with section 19961(c). We concur with the court's assessment that Measure H fails to convey the substance required by section 19961(c) in three ways, all of which, taken together, render it not substantially compliant.

First, in contrast to the language in section 19961(c), Measure H does not refer to the January 1, 1996 benchmark or describe how the measure would increase gambling beyond the amount permitted on that date. As Sutter notes, the trial court stated that, on its own, "the failure to refer to the 1996 benchmark was somewhat understandable since circumstances changed" (apparently referring to the 2010 increase in the number of permitted tables), although the court found this failure, taken together with other problems, "rendered the ballot form not substantially compliant." For its part, Sutter contends that inclusion of the 1996 benchmark "was not required and would have been superfluous and misleading," and that it was more appropriate to "describ[e] the expansion as compared to the existing number of tables."

In our view, the January 1, 1996 benchmark (one of the few elements of the ballot text set forth in § 19961(c)) remains important and its omission from Measure H is significant. As the Commission notes, the January 1, 1996 benchmark is a key element of the GCA's scheme for regulating the amount of gambling in California. For example, section 19961 defines an

"expansion of gambling" requiring voter approval as an increase of 25 percent or more (using specified metrics) compared to the amount permitted on January 1, 1996. (§ 19961, subd. (b); see *id.*, subd. (f) [prohibiting use of cumulative small increases to evade this rule].) Similarly, former section 19962 (the previous moratorium) used the same benchmark in specifying gambling could not be authorized or expanded beyond what was permitted on January 1, 1996. (Former § 19962, subds. (a), (b).) The Legislature again used the January 1, 1996 benchmark in current section 19962 (the new moratorium), which was enacted in 2023 and took effect on January 1, 2024. (§ 19962, subds. (a), (b)(1).)[20]

The fact permissible gambling increases have occurred in some local jurisdictions since 1996 (such as San Jose's increase in 2010) provides no basis to disregard the benchmark prescribed by the Legislature. Section 19961 aims to obtain an informed decision from voters as to whether or not they want to approve a new level of gambling that is significantly higher than the level authorized on the statutory benchmark date (without regard to whether the permitted amount of gambling has increased somewhat in the interim). (§ 19961, subds. (a)(1), (b); § 19961(c).)

Second, the trial court noted Measure H does not refer to "gambling," which again is one of the few terms in the ballot form set forth in section 19961(c).[21] Measure H does state it will "increase[e] card tables by

---

[20] The Legislature has enacted some exceptions that allow specific increases as measured against alternative benchmarks. (§§ 19961.06, 19961.07, subd. (a)(2), 19965.)

[21] We reject Sutter's assertion that, in conducting a de novo review of the sufficiency of Measure H's language as compared to the ballot text set forth in section 19961(c), the trial court (and this court) must disregard this defect on the ground the Commission assertedly did not refer to it at the meetings addressing Sutter's application.

29

30," although this language is found near the end of the ballot text, following a list of the purported benefits of the measure, rather than at the beginning as set forth in section 19961(c). We agree with the trial court that this change (using a blander term in place of "gambling" and giving it less prominence) is a relevant factor supporting the conclusion Measure H did not substantially comply with the statute.

We disagree with Sutter that "additional materials" provided to voters—specifically, an argument in favor of Measure H and the San Jose City Attorney's analysis of the measure—cured these deficiencies in Measure H. The cases cited by Sutter on this point, while finding such materials relevant in some circumstances, do not hold they are to be considered when determining compliance with a statute that specifies the form of *ballot language* that is to be used. (See *People v. Birkett* (1999) 21 Cal.4th 226, 243 [stating courts refer to ballot pamphlet analyses and arguments when interpreting an ambiguous initiative measure]; *Denny v. Arntz* (2020) 55 Cal.App.5th 914, 923–924, 916–917 [addressing a claim that a ballot analysis was unfair, in the context of an election contest under the Elections Code].) In any event, the materials at issue here do not correct the problems with Measure H's language—significantly, they do not refer to the 1996 benchmark or explain the increase in gambling in relation to it (although as to the term "gambling," the city attorney's analysis does use that term as part of an explanation that municipal law requires voter approval for expansions of gambling).

The third defect in Measure H identified by the trial court was its partisan language. (See *Citizens*, *supra*, 56 Cal.App.4th at p. 1228 [partisan language in ballot question on proposed measure "was a sufficiently egregious deviation from the prescribed form to fall outside the limits of

substantial compliance"].)  Buried near the end of the 74 words used to describe this proposal, which speaks at length of essential local services, social support services for those in need, and an increase in taxes on cardrooms to fund these services, are five words—"increasing card tables by 30"—that might arguably be understood to reference an expansion of gambling.  But what this vague reference to "increasing card tables" means is far from clear.  It comes out of the blue, without context.  Read as a whole, Measure H is a stark contrast to the neutral ballot language prescribed by the statute.

We need not address Sutter's argument that, because there was not a strong opposition to Measure H, the language of the measure should be viewed as *less* "partisan" than the ballot language at issue in *Citizens*, where there was an ongoing debate about the wisdom of the proposed gambling authorization at issue there.  (*Citizens*, supra, 56 Cal.App.4th at pp. 1226–1227.)  We agree with the trial court that the partisan language that was used in Measure H, in conjunction with the other problems mentioned above, render it not substantially compliant with the ballot form language set forth in section 19961(c).

**E.  *The Commission Properly Denied Sutter's Application To Operate More Tables***

Sutter contends that, even if Measure H did not comply with section 19961(c), the trial court should nonetheless have compelled the Commission to grant Sutter's application unless it determined that the defective ballot language affected the outcome of the election.  At some points in its briefing, Sutter goes further and asserts the only way section 19961(c) could be given effect was for the Commission to challenge Measure H's ballot language in a preelection writ proceeding in 2020.

In making these arguments, Sutter relies in part on cases that involved actions to contest elections under the Elections Code. (E.g., *Canales v. City of Alviso* (1970) 3 Cal.3d 118, 126, 123 [in action contesting election on the ground illegal votes had been cast, the contestants had to show the illegal votes determined the result]; *Denny v. Arntz, supra,* 55 Cal.App.5th at pp. 920–921 [court may only invalidate an election on grounds listed in Elec. Code, § 16100; a challenge to ballot materials is not a basis to contest a completed election and must be made preelection].)

But the Commission has not brought an action seeking to invalidate the 2020 election, and we do not agree the rules governing actions in that context should be imported into the Commission's application review process. We have held in part II.C, *ante*, that the Commission, in deciding whether to grant an application to operate more tables, may consider whether the application and any local government authorization on which it is based are in compliance with state law. That is what the Commission did here. The Commission rejected Sutter's second application after concluding that Measure H did not comply with section 19961(c), and therefore did not validly authorize the proposed table increase.[22] We decline to hold that the Commission has a ministerial duty to grant an application that conflicts with governing state law, or that it may only deny the application if it completes the procedural steps and makes the showings that would be required of a plaintiff seeking to block or contest an election.

---

[22] That is also what occurred in the case of Sutter's first application— the Commission denied the application (and the trial and appellate courts upheld the denial) because Measure H purported to authorize an increase that was barred by the GCA—specifically, the moratorium then in effect under former section 19962. (*Sutter's Place I, supra*, A163287.)

32

Sutter also relies on the decision in *Citizens, supra,* 56 Cal.App.4th 1199, to support its argument that the Commission must show the noncompliant ballot affected the outcome of the election. But while that case is in some respects similar to the present matter, it does not persuade us the Commission had a duty to grant Sutter's application. In *Citizens*, the plaintiff, a nonprofit public benefit corporation, filed a complaint seeking a writ of mandate and declaratory relief after "a series of actions by [the City of Albany], culminating in a vote of the electorate, to permit cardroom gaming at Golden Gate Fields, a horse racing track managed" by the real parties in interest, collectively referred to as Ladbroke. (*Citizens*, at p. 1205; *id.* at pp. 1206–1207.) Among the plaintiff's several causes of action in *Citizens* was one seeking declaratory or writ relief to "require[]" the City "to deny Ladbroke an application for a municipal gaming room license" because the ballot measure by which voters approved the project did not comply with the ballot form prescribed by what was then the Gaming Registration Act. (*Citizens*, at p. 1224; *id.* at pp. 1206–1207.) The trial court sustained a demurrer to that and some of the other causes of action and ultimately dismissed the complaint. (*Id.* at pp. 1205, 1207, 1224.)

On appeal, Division One of this court reversed in part, including as to the ballot form claim. (*Citizens, supra*, 56 Cal.App.4th at pp. 1230, 1228.) The appellate court concluded the ballot language used by the City did not substantially comply with the ballot form prescribed by the state gaming statute, in part because the measure submitted to voters included partisan language. (*Id.* at p. 1228; see *id.* at pp. 1225–1227.)[23] The court then stated

---

[23] The state statutory provision at issue in *Citizens* required voter approval for the licensing of new gaming clubs within a city and prescribed a ballot form for such elections: " 'The question shall appear on the ballot in

its decision on appeal from the sustaining of a demurrer was confined to determining that "the complaint reveals on its face noncompliance" with the state statute. (*Id.* at p. 1228.) The court stated: "We express no opinion as to the merits of this cause of action since factual issues remain to be decided concerning the effect, if any, that the ballot language had on the election results." (*Id.* at pp. 1228–1229, citing *Canales v. City of Alviso*, *supra*, 3 Cal.3d at p. 126.)

We need not address the parties' arguments as to whether this brief statement by the *Citizens* court amounted to dicta. However it is characterized, we are not persuaded the statement requires us to hold that the Commission had a duty to grant Sutter's application. Sutter seeks to compel the Commission, a state regulatory agency, to *grant* its application to operate more tables, something it claims the Commission must do without regard to Measure H's noncompliance with state law. That is quite different

---

substantially the following form: [P] "Shall card clubs in which any games permitted by law, such as draw poker, low-ball poker and panguingue (pan) are played be allowed in --?" [P] Yes-- No--' " (*Citizens*, *supra*, 56 Cal.App.4th at p. 1224.)

The ballot form used in *Citizens* "substantially elaborated" on the prescribed statutory language and stated: " 'Shall Ordinance 94-011, a gaming ordinance, zoning modification and Development Agreement, as printed in the Voter Pamphlet, be enacted to allow and regulate card room gaming at Golden Gate Fields, at which controlled games permitted by law, such as draw poker, low ball poker and Panguingue (PAN) are played, in order to provide revenue for the City of Albany, create jobs, provide for an Albany Bay Trail, and allow Albany waterfront access?' " (*Citizens*, *supra*, 56 Cal.App.4th at pp. 1224–1225.) Although the appellate court held it was permissible to combine the statutorily required ballot proposal with related proposals about such matters as a zoning modification and a development agreement (*id.* at p. 1225), it found no justification for other modifications to the statutory form, including "the reference to 'controlled' games" and the final phrase about providing revenue for the City, creating jobs, and providing other benefits. (*Ibid.*)

from the scenario in *Citizens*, where a nonprofit public benefit corporation sought an order compelling a city to deny a gambling license application based on noncompliant ballot language. (*Citizens*, *supra*, 56 Cal.App.4th at p. 1224; *id.* at pp. 1206–1207.)

Here, the City had a statutory obligation to submit the proposed language of Measure H to the Bureau for preelection input. All the City had to do to avoid potential problems for applicants securing an expansion under Measure H postelection was seek the Bureau's input early enough to ensure any feedback from the Bureau could be accommodated. The City apparently failed to do so, which put Sutter in the position of having to argue after-the-fact that the Commission is powerless to address a violation of the GCA the Bureau warned about before the election was held.

Even if the imposition of a prejudice test was correct in *Citizens* as an element the plaintiff on the record presented there had to show to obtain judicial relief, in our view it does not follow that Sutter—the party seeking relief here—is entitled to force the Commission to approve an expansion of gambling that was not properly submitted to the voters. To the extent the *Citizens* court's brief statement *can* be read to support the result sought by Sutter, we respectfully disagree with it. The onus is on local officials holding an election to ensure the ballot language exhibits the neutrality the GCA requires. It is not up to the Commission to make a showing, after the fact, that ballot language used in disregard of the Bureau's warning was outcome determinative.

We decline to hold that the Commission must ignore a ballot measure's noncompliance with section 19961(c). The incentives any such holding would create are incompatible with the governing statutory and regulatory scheme. Were we to so hold, our ruling would hardly promote compliance with the

law.  Rather, we would be sending the message that cities can avoid accountability for complying with section 19961(c) by placing initiatives on the ballot worded with a partisan slant, since, if the voters approve the initiative—which is, of course, the objective of partisan ballot language—the noncompliance will be beyond the reach of the Commission.  That is a recipe for undermining the effectiveness of both the Commission and the Bureau in regulating gambling under the GCA.

### III. DISPOSITION

The order denying mandate is affirmed.  The Commission shall recover its costs on appeal.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
SMILEY, J.*

---

\* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 4/30/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUTTER'S PLACE, INC., | A168427 |
| Plaintiff and Appellant, | |
| v. | (San Francisco City & County Super Ct. No. CPF-23-518029) |
| CALIFORNIA GAMBLING CONTROL COMMISSION, | |
| Defendant and Respondent. | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION; NO CHANGE IN JUDGMENT |

BY THE COURT*:

The court orders that the opinion filed in this appeal on April 8, 2024, be modified as follows:

1. On page 15, in the first sentence in the first paragraph of part II.B, remove the quotation marks around the word "validates" and change it to "validate" so the sentence reads:

   Sutter contends the statutory changes effected by Assembly Bill 341 (which reimposed the prohibition on most gambling expansions) validate the San Jose ordinance at issue, thus abrogating the Commission's basis for denying Sutter's application to operate more tables.

---

*Streeter, Acting P. J., Goldman, J., Smiley, J.** (**Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution).

There is no change in the judgment.

The opinion in the above-entitled matter filed on April 8, 2024, was not certified for publication in the Official Reports. On April 26, 2024, respondent California Gambling Control Commission filed a request that the opinion be published. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: April 30, 2024                           STREETER, Acting P. J.

Trial Court:     Superior Court of California, City and County of San Francisco

Trial Judge:     Hon. Richard B. Ulmer, Jr.

Counsel:     Coblentz Patch Duffy & Bass, Richard R. Patch, Stan Roman and Sarah E. Peterson for Plaintiff and Appellant.

    Rob Bonta, Attorney General, T. Michelle Laird, Acting Assistant Attorney General, Neil D. Houston and James G. Waian, Deputy Attorneys General, for Defendant and Respondent.